# Richmond.

## Mary Powell Burr, Administratrix of Charles Gilbert Burr, Deceased, v. Virginia Railway and Power Company.

### December 5, 1928.

The opinion states the case.

*John R. Saunders, Attorneys-General, Leon M. Bazile* and *Edwin H. Gibson, Assistant Attorney-Generals, Bernard C. Syme, W. Earl White,* and *Bramhall & McCabe* (of Washington, D. C.), for the plaintiff in error.

*T. Justin Moore, N. L. Flippen* and *Richard H. Mann,* for the defendant in error.

CHINN, J., delivered the opinion of the court.

This action was brought by Mary P. Burr, administratrix of Charles G. Burr, to recover damages for the death of her decedent resulting from injuries sustained in the terminal station of the Virginia Railway and Power Company at Petersburg, Virginia, on the evening of September 12, 1924, charged to have been occasioned by said company's negligence.

The case has been twice tried. At the first trial there was a judgment for the plaintiff in the sum of $10,000.00, which was reversed by the Supreme Court of Appeals, upon a writ of error obtained by the railway company, for errors committed by the lower court in instructions and in refusing to admit certain evidence. See *Virginia Railway and Power Company v. Burr*, 145 Va. 338, 133 S. E. 776. Upon the second trial the jury found a verdict for the plaintiff in the same amount, but the court set aside the verdict on the ground that

it is contrary to the law and the evidence, and entered final judgment for the defendant; and the plaintiff is now here asking for a review of that judgment.

The circumstances under which Mr. Burr met his death, as disclosed by the evidence adduced at the last trial of the case and now to be considered, may be stated as follows:

The Virginia Railway and Power Company (hereinafter called defendant) operates an interurban street railway between the cities of Petersburg and Richmond. Its terminal station in Petersburg consists of a train shed, ticket office, and waiting room. The shed into which the cars are run is a remodeled store building, facing west on Sycamore street, 102 feet eight inches long, and twenty-one feet eight inches wide, inside measurement. The front or western end of the shed is open. The back or eastern end is bounded by a brick wall. On the northern side there is also a brick wall running the entire length. The southern side is not so easily described. It may be said, however, that at the southwest corner of the shed there is an iron pillar, standing immediately at the property line, which supports the building at its west or Sycamore street end. Between this pillar and the western end of the southern wall of the shed is an open space eight and nine-tenths feet wide. The wall then runs east a distance of ten feet to a window-like opening therein, seven and one-tenths feet in width, and approximately two feet from the floor. On the eastern side of this opening the wall is again solid for about twelve feet to the freight platform, where there is another opening in the wall over this platform nineteen and one-eighth feet in width. The freight platform, which adjoins the southern wall on the inside of the car shed and runs back to the rear end of the building, is two feet high. At the rear or

east end the platform is about three feet wide, but beginning some six or eight feet from its western end, it tapers off at that end to a width of one and five-tenths feet. There are no steps from the inside of the shed to this platform, and, when a car is in the terminal, the platform is so close to the southern side of the car that the rear door on that side cannot be opened for the entry of passengers.

Adjoining the southern side of the terminal shed, running east and west, is an alleyway ten feet wide, and across the alley to the south, and opposite the open space between the iron pillar and brick wall above referred to, is the entrance to defendant's ticket office and waiting room.

The car track enters the terminal from Sycamore street on a sharp curve, and gradually straightens out on the inside of the building until it runs in a straight line parallel with the walls of the shed to the rear. The southern rail of the track after it straightens out is five feet from the southern wall of the shed, but the car by which Burr was killed had an over-hang on each side of the track of one foot seven and three-fourths inches, thus leaving a passageway between the car and the southern wall, when the car is standing in the station, three feet four and one-fourth inches wide. When emerging from the station, however, owing to the curve of the track, the car makes a wide side-swing into this space which brings its rear end in close proximity to the wall for a distance of twenty feet or more —the space between the car and the wall at the closest point being only two and one-half inches.

The floor plan of the terminal shed, showing the track, and with a dotted line showing the lateral swing of the car as it moves out of the station into Sycamore street, is herewith filed for reference.

# 3

STATION OF

VIRGINIA RAILWAY & POWER CO.

PETERSBURG, VIRGINIA

OCT. 28, 1926.

1" = 10'

CARTER R. BISHOP C.R.E.

218.'

4'

22.6'

38'

.8

102.8'

5'

9.6'

3.4'

FREIGHT PLATFORM

12.8'

17'

8.9'

Dotted line is trace of rear end of car going out

SYCAMORE ST.

The terminal shed is paved on both sides of the track on a level with the sidewalk of the street, and both sides of the shed are equally illuminated by electricity. When cars are in the terminal there is a space on the north side between the wall and the car of approximately eight and one-half feet, and passengers generally board and alight from the cars at both the front and rear doors on that side. It is also true, that passengers are in the habit of boarding and alighting from cars standing in the terminal at the front door on the southern side, opposite the ticket office. The car involved in this case, known as No. 726, is a two-way car, with a vestibule at each end equipped with folding type doors on each side thereof. The section of the folding door which is attached to the mullion or corner post of the car is divided into two parts, so that the upper half of this section may be opened independently of the balance of the door. When the car was in the terminal on this occasion this part of the door at the rear end on the southern side, and next to the freight platform, was open.

On the evening of the accident Burr, the decedent, went to the terminal station with his friend, Mr. F. S. Farrar, for the purpose of taking the car which was scheduled to leave the terminal for Richmond at 8:35 P. M. He was employed as State Club Agent of the Agricultural Division of the Virginia Polytechnic Institute, at Blacksburg, and had come to Petersburg to confer with Mr. Farrar, who was engaged in the same line of work. After arriving at the station Burr and Farrar conversed a few minutes at the northwest corner of the terminal shed. Burr then crossed over to the ticket office to buy his ticket, and returned to where he had left Mr. Farrar; and, after continuing the conversation a few minutes longer, looked at his watch

and said to Farrar: "It is time to get on the car."
Both men then walked across the track in front of the
car, when Burr turned to the left on the southern side
of the track, and Farrar continued south on Sycamore
street. At that time the car was standing still, and no
starting signal had been given. Farrar testifies that
he had walked across the alleyway and had proceeded
up Sycamore street for a distance of "six or eight
steps" before he heard the car start out of the station;
and had gone "four or five steps" further when he
heard "the scream of a man." He then went back to
the terminal and found Mr. Burr lying between the
southern rail of the track and the south wall, about
four feet east of the western end of the wall. The
autopsy disclosed that his breast bone, ribs, and pelvic
bone had been crushed, and his internal organs badly
lacerated. As to the exact position of the car while
standing in the terminal the evidence is somewhat in
conflict. Mr. Farrar thinks the front end of the car
was approximately even with the western end of
the south wall, while the motorman testifies that the
cars were usually placed with the front end extending
three or four feet to the west of the wall. It, therefore,
seems evident from the measurements given that this
car, which was fifty-three and six tenths feet long, must
have extended, at the least, sixteen or eighteen feet
back from the western end of the freight platform.
The motorman also says that shortly before the time
for leaving the terminal arrived, he stood at the front
door of the car on the southern side looking down the
passageway between the car and the south wall, as
he was in the habit of doing, and saw no one in there;
that when he boarded the car to make ready to start, he
first closed the vestibule doors, lowered the trap door

over the steps, got his reverse lever and air handle from over the door and put them in place, then took his position on the right hand side of the vestibule, and signaled the conductor that he was ready to go; and, upon receiving an answering signal from the conductor, pulled out of the station, but did not look down the passageway after he got on the platform.

Little is known as to the decedent's movements after he parted from Mr. Farrar, but it seems reasonably clear that, finding the front door on the south side closed, he then hurried down the passageway between the car and the south wall with the intention of entering the car at the rear door on that side, and when the car began to move out of the station he had gotten too far down in this space to extricate himself. According to Mr. Farrar, he had walked approximately twenty-six feet, after separating from Burr, before the car started to pull out. A passenger sitting within twelve feet from the rear end of the car saw Burr pass by a window, just after the car started, apparently on his way to the rear; another passenger standing on the rear platform states that after the car had started, and a few seconds before the tragedy occurred, he heard "something shatter at the door," but did not pay any attention to it until he heard the scream, when he looked out and saw Burr holding on to the rear grab-handle of the door with his left hand, and falling behind the car, but Burr screamed "before he got into that close place;" and still another passenger, standing in the same vicinity, says that after the car had traveled twenty or twenty-five feet he heard "something hit against the door," and when he looked it seemed to him Burr was falling or stepping backwards, and it was not until a few seconds afterwards that he heard Burr scream and felt the car give a jolt. In view of this

evidence the jury had the right to conclude that decedent had gotten down the passageway at least as far as the first window-space in the wall, if not as far as the freight platform, before the car began to move out of the station, and that while opposite this window-space he threw himself against the door and seized the grab-handle (if he actually did so) in a frantic effort to save himself, and not for the purpose of boarding a moving car, as defendant contends.

Whether Burr's body was mashed between the western corner of the window opening and the car while trying to lift himself over the low place in the wall, or whether he was making an effort to escape by re-tracing his steps, is not necessary to be determined. Either fact is inferable. In any event, since it appears to be reasonably certain that at the time Burr struck against the door and before he was killed, he was somewhere east of the western corner of this opening, the jury had the right to infer that he must have then realized his peril and that whatever he did was in an effort to preserve his own life.

It is earnestly insisted by defendant that the narrow passageway in which decedent was killed was an obviously dangerous place, and he lost his life through his own negligence. The basis of the argument is that the curve in the track gave notice of the side-swing of the car, and it could be seen that the car could not be boarded at the rear end on account of the freight platform. The evidence is that Mr. Burr was a stranger in Petersburg and hence had no previous knowledge of these conditions. It is a matter of common knowledge that the extent of the side-swing of the car depends not only upon the curve in the track but also upon the location of the rear wheels under the car, which appear from the exhibits filed in evidence

to be some distance up under the body from the rear end. That Burr should have observed and deliberated upon all this, is, we think, more than can be expected of a passenger who has the right to assume that the premises to which he is invited are free from such dangers as that which he encountered and which cost him his life. He doubtless saw passengers boarding the car on the south side, and finding the front door on that side closed, saw before him a paved, well lighted, open passageway over three feet wide leading towards the other end. There were no signs about the station directing passengers where to get on, and no signs or obstructions of any sort to indicate the place was dangerous. Under these circumstances the question of whether the decedent was guilty of negligence was for the jury to decide, and not a pure question of law for the court. As said in *C. & O. Ry. Co. v. Harris*, 103 Va. 635, 49 S. E. 997, while "passengers by rail should enter and leave cars by such methods as are *to their knowledge* provided for that purpose * * * *, if the proper side or method of entry is not obvious, and the passenger is not proved to have sufficient notice otherwise, he cannot be held in fault for selecting any method which is consistent with ordinary care."

In support of their contention that decedent was negligent in entering the space in which he was killed, counsel for defendant place much stress upon certain statements extracted from the former opinion in this case, wherein Judge Prentis, says:

"Because of the curve of the track and the necessary swing of a car as it entered the street, the narrow space between a moving car and the wall became obviously dangerous *to one then standing there*." (Italics supplied.)

"It is difficult to account for this tragic accident.

It must be remembered that no sufficient reason has been suggested as to Burr's being so far down in the alleyway as to be unable to save himself. The south wall against which he was crushed did not extend to the front of the building, and as the south front door of the car was at the point of the greatest danger—that is just east of the front end of the wall, then it was only necessary to take a few steps towards Sycamore street and into the open space to reach a position of safety."

The above observations of the court were based upon the theory that Burr went no further into the passageway than the place he was found lying after the casualty, and was standing there when the car emerged from the terminal, and could, therefore, not only have seen the danger caused by the side-swing of the car, but could easily have stepped back a few feet around the west end of the wall into a place of safety. As we have previously stated, however, evidence produced at the second trial of the case shows, or strongly tends to show, that decedent, evidently intending to board the car at the rear, went much farther into the alleyway, and had no opportunity to observe the extensive swing the car was making until too late to extricate himself in the manner suggested by the court. In view of this material discrepancy in the evidence, the expressions above referred to are not applicable to the case as it now stands before us, but we deem it necessary to refer to the subject in order to dispel any apparent conflict of view between the former opinion and the conclusions herein expressed.

But if it be conceded that decedent was negligent as defendant contends, we think the evidence amply sufficient to warrant the jury in finding that the defendant should have avoided the accident.

As we have seen, Burr must have gone down the

passageway after the motorman boarded the front platform and while he was making his preparations to start. At that time the conductor was standing on the rear platform waiting for the motorman's signal that he was ready to go. He testifies that when the motorman rung his bell, he looked out down the northern side of the car to see that "everything was clear," and then signaled the motorman to go ahead, but did not look out on the southern side. It is perfectly clear that if he had looked out through the opening in the door on the southern side also, before he signaled the motorman, he would have seen Mr. Burr coming down this passageway and the casualty would not have occurred.

The conductor admitted on cross-examination that he could have looked out on the south side and have seen plainly all the way up the passageway; that it would not have taken "over a couple of seconds anyway" to have looked, and if he had done so and found anyone in there, he would not have started the car. He knew that passengers regularly boarded the car at the south front door in close proximity to the passageway between the car and the wall; that on account of the swing of the car, the place was highly dangerous, and that there were no signs of warning about the station. There is also evidence that people sometimes entered this passageway when cars were standing in the terminal. Under these circumstances it would have been no more than ordinary care on his part, before giving the final signal to start, to have looked up the passageway to see that no one around the station happened to be in there.

In the case of *Meanley* v. *Petersburg, Hopewell and City Point Railway Company*, 133 Va. 173, 112 S. E. 800, the plaintiff, who went to the defendant's station to meet a relative, disregarding the signs and obstruc-

tions provided by the defendant, went to a place on the premises he was forbidden to go, and was injured by the open door of one of defendant's street cars while turning upon a loop in the track. While holding that the plaintiff was clearly guilty of contributory negligence under the circumstances, Judge Prentis, in delivering the opinion of the court, said:

"It is the duty of such companies at and about railway stations to which people are invited to come, and where they may be constantly expected, to operate its trains there with reasonable care proportioned to the danger which the circumstances create. Under the circumstances of this case, this imposed upon the company not the duty to provide for the absolute safety of persons who were themselves negligent in going to forbidden places and where they should not have gone, but to move its cars with reasonable care, and this involves exercising a reasonable lookout for persons naturally to be expected to be in that vicinity."

The doctrine stated in the above case applies with even greater force in the instant case, considering the facts and circumstances which have been outlined. Notwithstanding, therefore, the decedent may not have exercised reasonable foresight and prudence in going where he did, since it plainly appears that the accident would not have happened if the defendant, in the exercise of reasonable care, had performed its duty of a lookout at the time, the proximate cause of the accident must be attributed to defendant's negligence and not to the negligence of the decedent.

It is well settled, under the doctrine of last clear chance, that when the defendant could have avoided the injury by the exercise of ordinary care, and failed to do so, he is responsible, although the plaintiff may have been negligent in exposing himself to peril, and although

his negligence may have continued until the accident happened. *Norfolk, etc., R. Co.* v. *Crocker*, 117 Va. 327, 84 S. E. 681; *Kabler* v. *Southern Railway Company*, 121 Va. 90, 92 S. E. 815, and cases therein cited.

It may be said that the negligence of the defendant in this case has its origin in its undertaking to operate its interurban cars in and out of a building which was not intended or suitable for the purpose. While a railway company is not required to exercise a guardianship over its passengers, who are adults and mentally competent, it is its duty to provide reasonably safe and adequate stations and approaches for its patrons, and to operate its trains in and out of its terminals with due regard to the safety of those who are invited to come there. The terminal in which this casualty occurred was only twenty-one feet eight inches in width, while the car was eight feet nine inches wide and over fifty-three feet long. Because of the curve in the track made necessary by the location of the building, it seems apparent that the building was too narrow to be safely adapted to the purpose for which it was used. In view of the existing conditions, we think it was defendant's duty to use more than ordinary care and caution in moving its cars in and out of the terminal, certainly to no less extent than to keep a careful lookout in going in and out, and in posting signs calculated to advise those who had no *previous knowledge* of the danger attending the operation of the cars. Notwithstanding the curve in the track it would not be likely to occur to any reasonably prudent person, who had not seen them going in and out, and who had not stopped to calculate, that the cars would swing diagonally across the track to the extent disclosed by the photographs exhibited in evidence,

and thereby convert an apparently safe place into an exceedingly dangerous one.

During the trial of the case in the court below the defendant excepted to certain rulings of the court, which have been brought up on cross-assignment of error, and which, in view of the conclusions already expressed, have to be considered in order to determine whether the case should be remanded for a new trial or whether final judgment should be entered here for the plaintiff.

It appears that during the argument of the case before the jury, counsel for the plaintiff made the following statement:

"Here is the motorman, who said he always looked up in this space every time before he pulled out; that it was a matter of habit. He knew and I know and you know why he looked up in there; it was because he knew that people went up in there, and he was looking to see," * * *

This statement was objected to on the ground "that there is no evidence to show that people went up into the space, and counsel went outside the record to assume the motorman's reasons. The court overruled the objection, and this ruling constitutes the first cross-assignment.

We find no merit in this assignment.

The mortorman testified that he always looked into the space between the car and the wall before he took the car out:

"Q. Why did you do that?

"A. Just a habit I suppose. I formed the habit.

"Q. So that you got the habit of looking in that space all the time?

"A. Yes, sir; I never got on that car in that station in my life that I did not look back there, that I remember."

In addition, another witness testified on cross-exam-

ination that he had seen at least twenty people enter this space.

In making the statement objected to, counsel for the plaintiff was commenting on the above evidence and making his own deductions therefrom as to the motorman's reasons for forming the habit of looking into the passageway before he boarded the car. Since he did not misstate the evidence from which his conclusions were drawn, we think the argument was legitimate. As stated in 38 Cyc. page 1486: "He (the attorney) may state all proper inferences from the evidence, and may draw conclusions from the evidence in his own system of reasoning." See also *Sims* v. *Commonwealth*, 134 Va. 736, 115 S. E. 382.

The remaining cross-assignments relate to objections made by the defendant to instructions 2, 3, 4 and 5, given by the court at the request of the plaintiff.

In substance, the objections to instruction 2 are, that it embraces a wrong theory of the case under the evidence, and does not properly define the obligation resting upon the plaintiff under the doctrine of last clear chance; and the gravamen of the objections to the other instructions is, that there is no evidence upon which they can be predicated. While we do not wish to be understood by counsel as disposing of these objections in a summary way, we deem it neither expedient nor necessary to enter into a detailed discussion of them. The principles of law involved are well settled, and we consider the evidence, which has already been stated, is amply sufficient to justify the court in giving them. Such a discussion would, therefore, be unprofitable.

It appears that the court gave altogether seventeen instructions, six of which were granted for the plaintiff, and eleven as offered by the defendant.

Although there may be some slight ground for criticism of the phraseology employed in instruction 2, we find nothing in the instruction, when applied to the evidence in the case, which is likely to have misled the jury, or which would justify us in setting aside the verdict and granting a new trial on that ground. To repeat the language of Prentis, C. J., in *Bryant* v. *Fox's Adm'r*, 135 Va. 305, 116 S. E. 459:

"The instructions given at the instance of the defendant directed the attention of the jury to the evidence relied on to defeat the recovery, which if credited would have justified a favorable verdict. When all the instructions are read together it appears that the conflicting contentions of the parties were fairly submitted."

For the foregoing reasons the judgment of the lower court will be reversed, and judgment entered here for the plaintiff in accordance with the verdict rendered by the jury.

*Judgment reversed.*

McLemore, J., dissenting:

I do not think the movement of the street car from the shed was accompanied by any act of negligence, either of commission or omission. The same manner of handling the car was employed that had been followed hourly, day and night, for a long span of years and with no casualties.

The plaintiff's intestate was clearly guilty of negligence, indeed this is practically decided in the case, when previously before the Supreme Court of Appeals, Prentis, C. J., saying:

"Because of the curve in the track and the necessary swing of a car as it entered the street, the narrow

space between a moving car and the wall became obviously dangerous to one then standing there." *Virginia Railway and Power Company* v. *Burr*, 145 Va. 338, 133 S. E. 776.

In the same case the court approves an instruction which uses the following language:

"It was the duty of the plaintiff's intestate in attempting to board the defendant's car to exercise reasonable care for his own safety and the defendant's employees had the right to assume that he would exercise his senses. While passengers are entitled to expect and demand from carriers the highest degree of care for their protection and safety, this rule does not go to the extent of requiring carriers to exercise guardianship over passengers who are adults and mentally competent, or to undertake to coerce them into the exercise of ordinary care for their own safety. Neither are carriers insurers of passengers."

This instruction was refused by the trial judge and the opinion says its refusal was, under the circumstances, reversible error.

That there was no last clear chance to save Burr, after he had placed himself in the position of peril that instantly resulted in the accident, seems obvious. It follows therefore that the plaintiff's negligence was the cause of or contributed to his death and there should be no recovery.