# Richmond

## GERTRUDE H. EDGERTON, ADM'X, ETC. V. NORFOLK SOUTHERN BUS CORPORATION, ET AL.

April 26, 1948.

Record No. 3301.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Wm. G. Maupin* and *Clyde W. Cooper,* for the plaintiff in error.

*Jas. G. Martin & Sons, Tom E. Gilman* and *Williams, Cocke & Tunstall,* for the defendants in error.

BUCHANAN, J., delivered the opinion of the court.

Kenneth Earl Edgerton, a twelve-year-old boy, was killed by a bus which was owned by Norfolk Southern Bus Corporation, herein referred to as the Bus company, and then being driven by Robert J. Ferebee.

The bus was coming out of a bus terminal which was owned and operated by Richmond Greyhound Lines, Incorporated, herein referred to as the Greyhound company. The boy's death was caused by the left rear wheel of the bus running over his head and crushing his skull. The accident happened on High street in Portsmouth on August 14, 1946, in daylight, about five o'clock in the afternoon of a clear day.

His mother, as administratrix, brought suit against the Bus company, Ferebee and the Greyhound company. The negligence charged against Ferebee and the Bus company was failure to keep the bus under proper control, to keep a proper lookout, to blow the horn and to stop on emerging from the terminal. The negligence charged against the Greyhound company was failure to keep in operation a bell and light previously used to warn pedestrians that a bus was coming out of the terminal.

There was a trial by jury which resulted in a verdict for the plaintiff for $10,000 against all three of the defendants. This the trial court set aside and entered judgment in favor of the defendants. This appeal brings under review the correctness of that ruling.

High street, in Portsmouth, runs east and west. The terminal building of the Greyhound company is on the south side of the street in the 100 block, which is bounded on the west by Crawford street and on the east by Water street. This block is heavily traveled by both pedestrians and vehicles. At its eastern end are the ferries to Norfolk and the Seaboard Air Line station.

The terminal building is located nearer to Crawford street on the west than to Water street on the east, it being stated in argument that it is about 40 feet from the Crawford street corner. It is built flush with the building line on the south side of High street and the buses emerge from a tunnel on its west side immediately onto and across the sidewalk into the street. This sidewalk is 20 feet 10 inches wide. The tunnel itself is just wide enough to permit the passage of a bus, and buses coming out cannot be seen by people walking on the sidewalk except by those directly in front of the tunnel. Likewise, the driver of the bus coming out cannot see persons approaching from either side on the sidewalk until after the front of the bus has entered the sidewalk.

Prior to this accident the City Manager of Portsmouth communicated with the Greyhound company as to the danger of the existing conditions, and following that the Greyhound company installed and began to operate on March 28, 1946, an electric device to warn persons on the sidewalk that a bus was coming out. By this device a beam of light 26 feet 4 inches back from the mouth of the tunnel would be interrupted by an outgoing bus, which caused a bell to ring and a red light to come on at the front of the tunnel. This signal was operated until June 21, 1946, when it was put out of operation by an accident and it remained out of operation until August 17, 1946, three days after the boy was killed.

When this signal device became out of order, the manager of the terminal called the Bus company's dispatcher and told him to issue instructions to all of his drivers to be sure to stop and blow their horns before crossing the sidewalk. This had been a standing order before that time. Ferebee, the driver of the bus that ran over the boy, knew the signal device was not operating and had instructions to blow his horn on coming out of the tunnel.

At the conclusion of the plaintiff's evidence and again at the conclusion of all the evidence, the defendants moved to strike out the plaintiff's testimony; and after verdict they

moved to set it aside and to enter judgment for them for insufficiency of the plaintiff's evidence, or else to set aside the verdict and award them a new trial for errors committed during the trial.

Defendant Ferebee, called for cross-examination as an adverse witness, estimated that his bus was about 26 or 27 feet long (the manager of the terminal said its length was 20 feet 10 inches). He testified that from the front end of the bus to his seat was a foot or a foot and a half and he could not see to the right or left until he started out of the tunnel; that he stopped and sounded his horn, looked both ways, saw his way was clear and continued on out; that when his front wheels were in the street he looked to his right and saw a Greyhound bus coming off the ferry; that the driver of that bus motioned for him to come on out and he continued in low gear at a speed he judged to be three to five miles an hour and came out of the tunnel; that he stopped and sounded his horn before any part of his bus had emerged from the tunnel and he could not then see except directly in front of him; that nothing had happened up to the time the Greyhound driver motioned him to go ahead, and he did not see a man in front of him who had to dodge to keep out of his way, and that he did not see the boy, but the front end of his bus did not hit him; that when his front wheels got about to the middle of the street and his back wheels were off the sidewalk, he heard somebody hollo; that he stopped and came back and found the boy lying in the street.

No witness for the plaintiff saw the bus strike the boy, but three of her witnesses testified they saw the wheel of the bus run over him. Sam Warren was walking west on High street about the middle of the sidewalk when the bus emerged from the tunnel. He testified that he did not see it stop or hear any horn or other warning and he had to step "good and fast" to get out of its way; that after he stepped around the bus somebody screamed and as he turned and looked this child was under the bus and seemed to be crawling the same way as the bus was going; that

the child was then on the sidewalk about 3½ feet from the street and about the middle of the bus, the front of which was then just hitting High street; that when the bus got out on the sidewalk the boy turned around on his elbows and started to crawl from under the bus but the rear wheel got him and ran over his head; that he did not meet the child coming east from Crawford street and he was positive that no child came from that direction.

Edwin R. Turner was standing in a news stand on the southwest corner of Crawford street, about 125 feet away, looking east down High street toward the ferry through a window. He testified that he saw the bus coming out and when he saw the boy he was under the bus trying to get up when the wheel caught him; that the boy was then on the sidewalk close to the curb; that he had not seen the boy between him and the bus.

Captain Ferris was in front of the bus station on the sidewalk when the accident happened. The station, or waiting room, adjoins the tunnel on the east. He testified that he was in front of the tunnel and saw the bus driver close the door of the bus back through the tunnel at the landing zone, 50 or 60 feet from the sidewalk; that he then turned around and was just starting through the door of the waiting room when he heard somebody shout. He turned around and saw the bus crossing the sidewalk. The rear end of the bus was then just clear of the sidewalk. At that time a lady fell on the sidewalk in front of the waiting room door. He thought she had been struck by the bus and kneeled down to see about her. She had fainted, evidently, from seeing the boy run over. When he looked up from her the bus was out in the street and the boy's body was lying in the gutter on the west side of the sidewalk driveway, his feet just about touching the driveway slope into the street. He testified that the driver did not blow his horn when he came out of the tunnel. He said there was parking space for two taxis between the tunnel and the Crawford street corner and that at the time of the accident two cars were parked there.

Mrs. Vick, a passenger on the bus, testified that the driver did not stop before he came out of the tunnel on to the sidewalk. A police officer testified that after the accident the boy was lying with his face in the street and his feet in the gutter close to the curb on the west side of the driveway.

Mrs. Edgerton, the boy's mother and the administratrix, testified that Kenneth was twelve years old on April 28, 1946; that he left home about three-thirty that afternoon to go with his small cousin who was to catch a bus to Newport News, after which Kenneth had permission to go to a picture show in the High Theatre next to the bus station on the east; that he was just an ordinary child, small for his age, obedient, bright in school where he was in the fifth grade, and that he knew his way around town.

On the case as thus made for the plaintiff it was not error for the trial court to overrule the motion to strike, as will more fully appear from the discussion of the facts following the statement of the defendants' evidence.

For the defendants, Kocen, the driver of the Greyhound bus that was coming off the ferry, testified that he first saw the Ferebee bus right at the entrance to the tunnel; that it had then emerged a little from the tunnel and was not then moving; that his bus was the first vehicle off the ferry and all the others were behind him (Ferebee had testified that all of the others were off and this bus was the last); that he motioned for Ferebee to come on and just as Ferebee cleared High street he saw a person lying under the rear wheel of the Ferebee bus on the west side of the tunnel driveway; that after Ferebee emerged from the tunnel he did not stop until his rear wheels were three or four feet beyond the curb.

Mrs. Crawford, a passenger on the bus, testified that the bus stopped before it came out of the tunnel and then came out slowly and stopped when somebody holloed; that she was sitting back of the driver and did not see the child.

James E. Davis testified that he was standing at the front of his cab directly across the street from the terminal and

saw the boy run down High street from Crawford street and into the side of the bus about eight feet from the front when the front end of the bus was about two feet past the curb into the street; that the impact knocked the boy down into the gutter and the left rear wheel ran over him; that the boy was running more to the left of the sidewalk toward the gutter. On cross-examination he said that if there had been cabs parked on the other side of the street he could not have seen the boy; that the boy was not paying any attention "like all kids."

Mrs. Mary Belcher was standing in front of the drug store on the northwest corner of High and Crawford streets, diagonally across the street from the bus station. She testified that this boy came in a trot looking out toward the street, apparently going to cross the street, with the side of his head to the bus and that he just ran into the side of the bus; that he hit the bus with the side of his face and fell but she could not see the bus run over the child; that the front part of the bus was then off the curb; that the reason she could not see the wheel run over him was that a car pulled up; that if there were cars parked on that side she could have seen between the cars; that the boy was not running—just in a trot; that he was right at the curb, or just off the curb when the bus hit him.

R. W. Langman testified that he was across the street at an angle from where the accident happened; that the bus stopped before it got out of the tunnel; that he did not see the boy but heard a scream; that he looked as the bus was starting its turn in High street and saw the child lying in the street with his head facing west and his feet toward the terminal.

Mrs. Doris Rhinehart was in the theatre ticket office next to the terminal on the east and testified that she saw this boy coming toward the bus terminal in a pretty fast trot with his head over his left shoulder; that the bus came out of the terminal and stopped just as it got to the door and went on across the driveway slowly and when the front of the bus came out into the street the boy was coming

toward it and kept moving nearer to the street, not watching where he was going; that he lost his balance near the curb, which threw him against the bus just in front of the left rear wheel that ran over him. The boy was on the opposite side of the bus from her but she testified that she was sitting in the ticket booth, "up high but not so high," and saw these things underneath the bus.

At the conclusion of the evidence the jury were taken for a view of the scene of the accident and we were told in argument that they looked from this ticket booth.

■ Upon the evidence thus presented, we think the trial court erred in setting aside the verdict as to the defendant Bus company and as to Ferebee, its driver. The testimony was such that reasonably fair-minded men might well differ as to the correct inferences to be drawn from it. The controlling rule is thus stated in *Hoover* v. *Neff & Son,* 183 Va. 56, 62-63, 31 S. E. (2d) 265, 268, quoting from Burks' Pleading and Practice, 3rd ed., p. 543:

" 'It is not sufficient that the judge, if on the jury, would have rendered a different verdict. It is not sufficient that there is a great preponderance of the evidence against it. If there is conflict of testimony on a material point, or if reasonably fair-minded men may differ as to the conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight to be given the testimony, in all such cases the verdict of the jury is final and conclusive and cannot be disturbed either by the trial court, or by this court, or if improperly set aside by the trial court, it will be reinstated by this court.' " See also, *Standard Dredging Co.* v. *Barnalla,* 158 Va. 367, 373-74, 163 S. E. 367.

The credibility of the witnesses, their opportunities to observe, the weight of their testimony, and the reasonable inferences to be drawn therefrom were questions for the jury to decide. From the evidence they had the right to believe that Ferebee drove the bus out of the tunnel and across the sidewalk without stopping, which was in violation of the statute (Code, section 2154(109)(e));

that he failed to blow his horn, in violation of his instructions and of his duty to use reasonable care for the safety of persons on the sidewalk; and that he failed to keep a proper lookout.

The jury could have believed that at the mouth of the tunnel Ferebee was looking at the driver of the Greyhound bus coming off the ferry to his right, who was motioning for him to come on out, and that thereafter he failed to look out for people on the sidewalk. He did not see Warren, who passed immediately in front of him, and he did not see the boy, whom his three witnesses, casual bystanders, testified they saw coming in a trot toward the bus, looking away from it and obviously unconscious of its presence across the sidewalk. If Ferebee had looked to his left at any time after he came out of the tunnel he could have seen what these three witnesses said they saw.

The jury were warranted in saying that these derelictions existed and that they constituted negligence.

The boy who was run over and killed was under 14 years of age and, therefore, presumed to be incapable of negligence. There was no evidence sufficient as a matter of law to overcome this presumption. There was evidence that he was an average boy and that is the type of child to whom the presumption applies. The question of his capacity was submitted to the jury by proper instructions and their verdict for the plaintiff was conclusive as to his incapacity. There was, therefore, no contributory negligence to bar recovery. *Morris* v. *Peyton*, 148 Va. 812, 820-21, 139 S. E. 500; *Filer* v. *McNair*, 158 Va. 88, 93, 163 S. E. 335.

That leaves only the question whether there was causal connection between the negligence of the bus driver and the death of the boy. The defendants contend that the act of the boy was the sole cause of his death and that if the driver of the bus was negligent, his negligence was not a proximate cause of the accident. We think that, too, was a question for the jury under the evidence.

As the jury viewed it, the driver was negligent in not stopping. If he had stopped at the mouth of the tunnel it was a permissible inference for the jury that the boy would have had time to get by without colliding with the bus, or would have reached a point where the driver would have noticed him. The defendants' evidence was that he was running, or trotting, near the curb and the bus had to cross the 20 foot 10 inch sidewalk to reach him.

It was a permissible jury inference that if the bus driver had sounded his horn he would have attracted the boy's attention and he would have turned his head in time to have seen the bus and avoided colliding with it. Without that warning the boy's sense of hearing was of no aid. His only means of knowing of the presence of the bus was his sight and he was looking away from the bus.

Again, the jury could have concluded, as stated, that the driver of the bus did not keep a proper lookout and from that it was a permissible jury inference that if he had properly looked he would have seen that this boy was oblivious of the presence of the bus across the sidewalk and he could then have sounded his horn or stopped the bus or otherwise warned him in time to make the presence of the bus known to the boy, or to have avoided running over him after he collided with it.

Whether there is causal connection between a defendant's negligence and a plaintiff's injuries is usually a question for the jury. It is only when men of reasonable minds may not fairly differ on the proper inferences to be drawn from the facts proved that it becomes a question of law for the court. See *Edwards* v. *Laurel Branch Coal Co.,* 133 Va. 534, 555, 114 S. E. 108; *Powell* v. *Virginian Ry. Co.,* 187 Va. 384, 46 S. E. (2d) 429; *Bly* v. *Southern R. Co.,* 183 Va. 162, 171, 31 S. E. (2d) 564, 570.

In the case last cited we approved this statement from *Tennant* v. *Peoria, etc., R. Co.,* 321 U. S. 29, 64 S. Ct. 409, 88 L. Ed. 520, which is applicable here:

" 'It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the

case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences. The focal point of judicial review is the reasonableness of the particular inference or conclusion drawn by the jury. It is the jury, not the court, which is the fact-finding body. It weighs the contradictory evidence and inferences, judges the credibility of witnesses, receives expert instructions, and draws the ultimate conclusion as to the facts. The very essence of its function is to select from among conflicting inferences and conclusions that which it considers most reasonable. *Washington, etc., R. Co.* v. *McDade,* 135 U. S. 554, 571, 572, 10 S. Ct. 1044, 34 L. Ed. 235, 241, 242; *Tiller* v. *Atlantic Coast Line R. Co., supra* (318 U. S. 54, 68, 63 S. Ct. 444, 87 L. Ed. 610, 618, 143 A. L. R. 967); *Bailey* v. *Central Vermont Railway,* 319 U. S. 350, 353, 354, 63 S. Ct. 1062, 87 L. Ed. 1444, 1447, 1448. That conclusion, whether it relates to negligence, causation or any other factual matter, cannot be ignored. Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable.' "

The Bus company and Ferebee contended that if the judgment is reversed there should not be final judgment against them here because of harmful errors committed against them in the trial. We do not think there are substantial grounds for this position.

They assert that it was error to allow in evidence the letter from the City Manager of Portsmouth to the manager of the terminal, above referred to, stating that quite often when buses emerged from the terminal the lives of pedestrians were jeopardized and expressing the hope that a method of signaling the exit of the buses might be found. When this letter was offered during the testimony of the City Manager, as a witness for plaintiff, it was rejected. Afterwards the terminal manager testified, as a witness for defendants, in regard to the operation of the signal device and was asked on cross-examination why it was in-

stalled. He testified that he had received this letter from the City Manager. The letter was then admitted. It stated nothing that was not obvious to the jury when they viewed the scene. It was introduced with reference to the liability of the Greyhound company. Its admission could have resulted in no harm to the Bus company and its driver, who had nothing to do with the installation or operation of the signal device.

The other complaints are to the granting and refusing of instructions. They do not require detailed discussion. None of those granted contained anything harmful to these two defendants. Those refused were either not applicable or sufficiently covered by other instructions. The only one touched on in the oral argument was refused instruction E, which would have told the jury that if the bus driver stopped and blew his horn just before entering the sidewalk and then proceeded carefully and slowly across, they should find for the Bus company. From what we have said above, this was not the driver's whole duty. He knew he was driving his bus across a heavily-traveled sidewalk where pedestrians, including children of all ages, were apt to be, and where they had a right to be—a right superior to his own so far as this evidence shows. Reasonable care required that he be alert and watchful against exposing them to perils, including perils that adults might be expected to guard against.

"The law recognizes the fact that children act upon childish instincts and impulses and requires those charged with the duty of care and caution toward them to calculate upon this and take precaution accordingly." *Morris* v. *Peyton*, 148 Va. 812, at p. 822, 139 S. E. 500, at p. 503. And see, *Brandes* v. *Freitas*, 116 Cal. App. 459, 2 P. (2d) 830, 831; *Hahn* v. *Anderson*, 326 Pa. 463, 192 A. 489; 5 Am. Jur., Automobiles, section 189, p. 609.

The negligence charged against the Greyhound company was its failure "to keep the bell and light in operation as signal and warning to pedestrians that a passenger bus

was leaving the terminal." Its evidence in excuse was that it used every reasonable effort to get repair parts and was unable to do so prior to the accident. Assuming that the jury had a right to conclude that this evidence was not a sufficient showing of reasonable diligence, although there was none to the contrary, the fact remains that such failure was not a proximate cause of this accident.

The signal beam that causes the warning bell and the light to function was 26 feet 4 inches back from the mouth of the tunnel. The bus was 20 feet 10 inches long, according to the terminal manager. The bell begins to ring and the light goes on, when the front of the bus reaches the signal beam. The bell stops ringing and the light goes off when the rear of the bus is about three feet past the beam. In the case of this bus, its front would lack two and one-half feet of being out of the tunnel when the bell and the light would go off. The terminal manager testified it would be about three feet on the sidewalk, but that was an error if his other figures were correct. In either event, both bell and light would have ceased to function before the boy was struck. He collided with the bus after the front of it had crossed the remaining width of the sidewalk and entered the street. The signal device was designed to warn of the approach of the bus to the sidewalk, not for the protection of pedestrians after it emerged.

This that was said in *McGlauflin* v. *Boston, etc., Railroad*, 230 Mass. 431, 119 N. E. 955, 956, L. R. A. 1918E, 790, although in a railroad crossing case where conditions differ, has some application here:

"The fact that the defendant maintained this electric appliance to warn the public against the danger of approaching cars and engines, and voluntarily assumed the duty without an order or request from the railroad commissioners, does not show that the arrangement was intended to protect travelers against the danger of collision with a car standing still on the track, or that the mechanism was operated for any such purpose. A failure to use a safety

appliance, adopted as a protection against some particular danger, cannot be relied upon to prove negligence when the injury is caused by another danger which the appliance was not designed to guard against; and the responsibility voluntarily assumed to maintain these signals imposes no higher duty upon a railroad company than the statute requires. There is nothing in *Cross* v. *Boston, etc., Railroad,* 223 Mass. 144, 148, 149, 111 N. E. 676, inconsistent with what is here decided. As the cause of the injury was not the failure of the gong to sound as the train approached the crossing, but the collision with a train of cars standing still, and as the electric appliance was not intended to notify them of such a condition, the plaintiffs cannot recover."

If the signal device here had been working, its light would have been out and its bell would have ceased to ring an appreciable time before the boy collided with the bus. It could not be fairly inferred from the facts and circumstances in evidence that if it had been in operation it would have averted the accident. Ferebee testified that the horn on his bus made more noise than the signal bell when it was ringing. If he had blown his horn or performed his other duties the warning of the signal device would not have been needed, even if it would have been effective.

Under the evidence, if negligence on the part of the Greyhound company be assumed, it is clear that Ferebee's failure to exercise the care incumbent upon him after his admitted instruction and knowledge that the signal device was not operating, became the sole proximate cause of the accident. The principle stated in *Hubbard* v. *Murray,* 173 Va. 448, 455, 3 S. E. (2d) 397, 401, applies here:

" * * * Where a second tort-feasor becomes aware, or by the exercise of ordinary care should be aware, of the existence of a potential danger created by the negligence of an original tort-feasor, and thereafter by an independent act of negligence brings about an accident, the condition created by the first tort-feasor becomes merely a circumstance of the accident, but is not a proximate cause

thereof. The original negligence of the first tort-feasor is legally insulated by the intervening independent negligence of the second tort-feasor, and the latter becomes the sole proximate cause of the accident."

The judgment of the trial court setting aside the verdict as to Richmond Greyhound Lines, Incorporated, is therefore affirmed.

The judgment setting aside the verdict as to Norfolk Southern Bus Corporation and Robert J. Ferebee is reversed, the verdict as to them is reinstated, and final judgment entered thereon in favor of the plaintiff.

*Affirmed in part, reversed in part and final judgment.*