# Richmond

## Norfolk Southern Railway Company v. W. E. Harris.

May 1, 1950.

Record No. 3643.

Present, Gregory, Eggleston, Spratley, Buchanan, Staples and Miller, JJ.

The opinion states the case.

*James G. Martin & Sons,* for the plaintiff in error.

*W. L. Parker,* for the defendant in error.

BUCHANAN, J., delivered the opinion of the court.

Harris, plaintiff below, recovered a verdict and judgment against Norfolk Southern Railway Company, defendant, for an alleged breach of his contract of employment as a locomotive engineer by the defendant. The defendant asserts here that the judgment was erroneous because the verdict was contrary to the law and the evidence, because of improper argument by plaintiff's counsel and because of erroneous rulings on instructions.

The plaintiff was discharged in September, 1946. He began working for the defendant or its predecessor in 1900, became an engineer in 1917 and had served continuously until his discharge, except for a period of about two years when he was unable to work because of injuries received in a collision. His contract of employment as an engineer contained these provisions:

"(a) Engineers will not be disciplined or dismissed from the service without a just cause. They will be given a hearing within five days if removed from service pending investigation and may hear the evidence submitted. They will be promptly notified in writing of the action taken against them, and should the charge be unfounded, they

will be paid for the time lost. Disciplinary action must be taken within thirty days after investigation or none will be applied."

The issue submitted to the jury was whether the defendant had just cause for discharging the plaintiff. The defendant claimed it did because the plaintiff had cursed his flagman and had run his engine, with some cars attached, up and down a sidetrack at Greenville, North Carolina, one of its railroad stations, four or five times in a fit of temper without signals or contrary to signals.

The fireman, the flagman and the conductor on the train plaintiff was operating, together with a supervisory agent of the defendant and the agent of the express company at Greenville, all testified for the defendant, in substance, that Harris was guilty of the conduct charged against him and had in fact operated his train as alleged, in spite of the fact that the only signals given him were to back up, and that he had finally backed into the bumper at the end of the track, doing some slight damage in the express car.

Harris denied that the incident happened that way. His version was that he backed his train in the usual way, stopped close to the bumper, and waited there 30 minutes or more while mail and express were being unloaded. During that period he ate his lunch and about the time he got through he heard a voice on the opposite, or fireman's, side of the train, from which the unloading was being done, saying, "Go ahead." His flagman had gone ahead to the street crossing, which a company rule and a city ordinance required to be guarded. Harris moved forward a distance of two or three cars and as he approached the crossing his flagman gave him a "wild wash-out signal" and pointed back. Harris looked back and the conductor was giving him a back-up signal. He backed up and stopped. The conductor again signaled him back. Knowing he was close to the bumper, which he could see by leaning out of his window, Harris stopped again. The conductor continued to signal him back and Harris tried to direct his attention

to the car being close to the end of the track. He gave his engine steam, backed up in accordance with the signal and struck the bumper, but did no damage. Thereupon the car was cut off, his train was coupled up and he pulled away without knowing that anything out of the ordinary had happened. He said he probably did apply to his flagman the epithet testified to by defendant's witnesses, when the former gave him the wash-out signal, but claimed that was ordinary railroad language and that nobody was mad so far as he knew.

The jury accepted the plaintiff's version and found that the defendant had no just cause to discharge him for that episode. That issue was for the jury under the evidence. The incident happened either as plaintiff said it did or as defendant's witnesses said it did. Plaintiff's evidence was not incredible and it was for the jury to decide whom they would believe. We cannot set aside their verdict because the greater number of witnesses testified in support of defendant's version. There were some contradictions among defendant's witnesses upon material points and at least two of them had made prior inconsistent statements which supported plaintiff's version.

It is the duty of this court to set aside a verdict that is plainly wrong or without evidence to support it. Code, 1950, section 8-491; *Smith* v. *Turner*, 178 Va. 172, 180, 16 S. E. (2d) 370, 373, 136 A. L. R. 1251. But where the conclusion depends on the weight to be given credible testimony, the verdict cannot be disturbed by this court or by the trial court. *Hoover* v. *Neff*, 183 Va. 56, 31 S. E. (2d) 265; *Edgerton* v. *Norfolk Southern Bus Corp.*, 187 Va. 642, 651, 47 S. E. (2d) 409, 414.

Defendant insists that the verdict should be set aside because of improper and prejudicial argument by plaintiff's counsel. In his opening argument plaintiff's counsel said this (referring to the investigation of the incident by a company official hereafter mentioned): "We have read to you from the cross-examination of this colored fireman a dire

threat as plain as could, that if he did not say what his superiors wanted him to say he had better look out for his job." Defendant objected and moved for a mistrial on the ground that this was arguing that defendant was putting pressure on the witnesses to make them testify as they had done. Plaintiff's counsel then read the evidence on which his argument was based and said the jury could put their own interpretation upon it. Defendant's counsel said, "The jury can draw their own inferences." The court then told the jury that "they may construe the words in any of the evidence in their common accepted meaning."

In his closing argument plaintiff's counsel said: "The only witness in this case who has any pretense of not being under the absolute dominion of the Norfolk Southern Railway is this express agent. * * As to the rest of them, all their jobs were dependent upon the Norfolk Southern. * * The facts speak for themselves. Two of the witnesses have changed their stories, and the Norfolk Southern is the dominant factor because it is the employer of these men."

Defendant objected and moved for a mistrial. The court refused to grant a mistrial, but gave the jury this instruction:

"Gentlemen of the jury, a few minutes ago counsel for the plaintiff used in his argument these words, that all the witnesses who testified in this case, save and except one, were under the absolute dominion of the Norfolk Southern, the defendant. The Court instructs you to disregard that statement. There is no evidence to the effect that any of the witnesses are under the dominion of any person."

In *Norfolk, etc., R. Co. v. Eley*, 152 Va. 773, 148 S. E. 678, relied on by defendant, there was a reversal because plaintiff's counsel in his closing argument had said that nobody had ever heard an engineer or fireman admit that he failed to blow for a crossing; that "his family and his meat and bread are dependent on it. He works for the railroad company, and the minute he comes in and says that he fails in that duty and subjects the railroad to damages: 'You are suspended, Mr. Engineer.'" 152 Va. at p. 776, 148 S. E.

at p. 678. The statement was excepted to because there was no evidence in the record that such had happened, to which the court replied that there was no evidence· of it but counsel was within his rights in making the argument.

It was held that the remarks were prejudicial; that there was no evidence that defendant's witnesses were influenced in any way by the hope of retaining their positions; that it was impossible to measure the harmful effect upon the jury of the statement, "not as a matter of opinion but as a matter of fact, that the 'bread and meat' of the witness and of his family were dependent upon the giving of false testimony," particularly when the court had given its approval to that language.

There are facts in the case in judgment that distinguish it from the *Eley Case* and prevent the result that followed there. Here the incident that preceded plaintiff's discharge happened on September 25, 1946. Three days later there was an investigation before an official of the defendant· at Raleigh, at which both the fireman and the flagman testified admittedly in direct conflict with their testimony on this trial. At the Raleigh hearing Wilbert Adams, the fireman, was being questioned by the official. Apparently his answers were not satisfactory and the official said: "I don't care what you could see. I want to know what moves Engineer Harris made after he first went in on No. 2 track with cars." The fireman replied that he went back a certain distance and stopped, then pulled ahead a certain distance and stopped. The official asked him whether he had ever moved backwards and forwards on that track four or five or six times. He said no. The official said: "Then that was a very unusual movement on the part of Engineer Harris?" Adams replied, "I wouldn't say because sometimes in spotting cars we have trouble and make 2 or 3 attempts to spot the cars. That's what I thought they were doing." Thereupon the company official said:

"Wilbert, this investigation is not in connection with any ·negligence on your part. However, I'm compelled to

say that you were very dilatory and negligent in performing the duties of locomotive fireman that you didn't pay any more attention to the unusual movements that were made at Greenville by No. 2 on September 25."

On the trial in the court below plaintiff's counsel read these proceedings to the fireman, and then inquired:

"Q. You knew what he was talking about?

"A. Yes, sir.

"Q. You would be the next one that the axe would hit?

"A. Going backwards and forwards is not an unusual movement.

"Q. I'm talking about that hint to you, what would happen to you if you didn't tell the right kind of story.

"A. I didn't tell the truth in the investigation."

Asked why he did not tell the truth, his explanation was that "if one railroad man get in trouble and goes before the Superintendent, you try to hold him up there."

Mallory, the flagman, who had stated at the Raleigh hearing that Harris did not curse him and he did not curse Harris, was asked whether he was swearing the truth in court or at the time he made his conflicting statements in Raleigh. He answered: "I was telling practically what railroad men tell when they want to work together." He asserted that he was not afraid of anyone, and then:

"Q. I didn't say you were afraid of anyone. I say you felt free to lie before your superior officer?

"A. No. A railroad can run you off their property at any time."

Here, unlike the *Eley Case*, plaintiff's counsel pointed to the record and argued to the jury that there was a threat to the fireman in the investigation at Raleigh, not as a matter of fact but as a matter of opinion; and the court told the jury that it was for them to construe the words.

Two at least of defendant's employees gave testimony on the trial different from their statements soon after the incident. Their explanation was that they testified falsely at Raleigh out of a sense of loyalty to Harris. Harris' counsel

had a right to argue that they were employees of the defendant and that, as an inference from their testimony, they were now testifying falsely out of a sense of loyalty or duty to the railroad company or with an eye to their own advantage. *Cf. Burr* v. *Virginia Ry., etc., Co.*, 151 Va. 934, 951, 145 S. E. 833, 839.

Plaintiff's counsel had no right, however, to argue that all of defendant's witnesses except the express agent were under the absolute dominion of defendant. There was no sufficient basis in the evidence to support that argument. There was enough, we think, to prevent its being classified as a gratuitous and indefensible effort to influence the jury to decide the case on feelings rather than facts.

Incidents occur where the harm done by improper argument cannot be remedied by instruction, and mistrials should then be granted or verdicts thereby obtained should be set aside. But such cases are the exception and usually it is a matter for the exercise of a sound discretion by the trial court whose ruling should not be disturbed unless there is a manifest probability that the complaining party has been substantially prejudiced. *Bourne* v. *Richardson*, 133 Va. 441, 454, 113 S. E. 893, 898-9; *McLean* v. *Commonwealth*, 186 Va. 398, 401, 43 S. E. (2d) 45, 47.

We think such probability does not appear in this case and that the court's instruction was an adequate remedy.

Plaintiff's evidence established that his discharge resulted in a loss to him of $400 a month for 14 months, or $5,600, which was the amount of the verdict. Defendant does not controvert this, but takes the position that plaintiff was not entitled to recover anything, or at most only nominal damages, because he was not employed for any particular time or term; that he could terminate the employment at will, and defendant had the same right. Rejection of this theory by the court in giving instructions for plaintiff and refusing instructions for defendant is the subject of another assignment of error.

By the contract the defendant agreed that it would

not dismiss the plaintiff from service without a just cause. Defendant's theory amounts to an assertion that it could violate that agreement without penalty.

It is settled doctrine in this State that where no specific time is fixed for the duration of an employment, there is a rebuttable presumption that it is an employment at will, terminable at any time by either party. *Hoffman Co.* v. *Pelouze*, 158 Va. 586, 594, 164 S. E. 397, 399; *Title Ins. Co.* v. *Howell*, 158 Va. 713, 718, 164 S. E. 387, 389.

Here, however, a definite time was fixed for the duration of the employment. It was, by the terms of the contract, to continue until the plaintiff gave to the defendant just cause to end it. The result of being discharged after long years of service in a particular occupation can well be serious. The defendant's agreement that it would not discharge plaintiff without just cause was a thing of value to him, a safeguard against the loss and embarrassment to be expected from an arbitrary discharge. The defendant's agreement that it would not be done was a term of plaintiff's employment, compensation for his work which he had earned along with his wages. The defendant ought not to take that promised reward from him without incurring a penalty for violating its agreement. It was a promise in return for services which the plaintiff performed and which furnished sufficient consideration for a binding contract. In such case the doctrine of mutuality is inapplicable. 12 Am. Jur., Contracts, section 14, p. 512. *Cf. Kiser* v. *Amalgamated Clothing Workers*, 169 Va. 574, at p. 585, 194 S. E. 727, at p. 731, 114 A. L. R. 1291.

In *Kirkley* v. *Roberts Co.*, 268 Mass. 246, 167 N. E. 289, the plaintiff was employed as a sales agent "as long as he shall faithfully and diligently perform the duties of his employment." There was no promise on the agent's part to remain with the company for any definite time. The court said: "This does not invalidate the contract, nor, of itself, make it terminable at the will of the company," and that the contract was binding upon the company "so long as the

agent faithfully and diligently performs and is willing and able to perform the prescribed duties at the compensation fixed." 167 N. E. at p. 290.

In *Seifert* v. *Arnold Bros.*, 138 Cal. App. 324, 31 P. (2d) 1059, the employment was "to be steady as long as your services are satisfactory." It was held that "the contract was subject to termination on the happening of a contingency, that is, the contingency of dissatisfaction, and the courts and text-writers have held such to be for a definite length of time."

To the same effect see *Gary* v. *Central of Georgia Ry. Co.*, 37 Ga. App. 744, 141 S. E. 819; *Mansell* v. *Texas, etc., R. Co.*, 135 Tex. 31, 137 S. W. (2d) 997; Labatt, Master and Servant, 2 ed., section 178, p. 566.

In Instruction P-2, given for the plaintiff, the jury were told that upon the plaintiff's proving his contract of employment and his discharge, it was then incumbent on defendant to "produce satisfactory evidence that the plaintiff's discharge was justified in fact." Defendant asserts that the instruction was erroneous, first, because the production of "satisfactory evidence" involves a much greater burden than the production of a "preponderance of evidence."

In *United Dentists* v. *Commonwealth*, 162 Va. 347, 357, 173 S. E. 508, 511, instructions were offered stating that the burden was on the plaintiff "to satisfy the jury." It was held not error to refuse them, because they were too broad.

An instruction identical with P-2 was approved in *Rudlin* v. *Parker*, 186 Va. 647, 652, 43 S. E. (2d) 918, 920, but on the ground that the defendant there had the burden of proving his defense by clear and satisfactory evidence.

In *Shiflett* v. *Virginia Ry., etc., Co.*, 136 Va. 72, 83, 116 S. E. 500, 504, an instruction had been given stating that the plaintiff must prove negligence "by a preponderance of the evidence and to the satisfaction of the jury." It was held that the latter clause, while not approved, was harmless, on the reasoning that it could hardly be understood as intending

to increase the burden of proof. See also, *Ashby* v. *Virginia Ry., etc., Co.,* 138 Va. 310, 329, 122 S. E. 104, 109.

There is less reason here than in the two cases last cited for supposing that the term "satisfactory evidence" as used in Instruction P-2 would be construed as creating a heavier burden than the usual and technically correct phrase "preponderance of the evidence."

We see no substance in the second criticism, *i. e.*, that the words "justified in fact" left it to the jury instead of the court to say what was sufficient ground for discharge. The court told the jury in plain words that if the plaintiff ran his train up and down the track as defendant alleged, he was properly discharged. The quoted words meant no more than that the defendant must produce facts to establish the charge.

There was no error in refusing defendant's Instructions 7-D and 10-D. The first was to the effect that number of witnesses was important as relating to preponderance of evidence, and the second stated that there was no evidence of malice. They were neither necessary nor appropriate.

We find no reversible error and the judgment below is

*Affirmed.*