755 F.2d 59
 118 L.R.R.M. (BNA) 3209, 23 Ed. Law Rep. 49
 Phyllis RODGERS, Appellant,
and
Ray Rodgers, Plaintiff,
v.
NORFOLK SCHOOL BOARD, Thomas G. Johnson, Jr., Dr. John H.
Foster, Jean C. Bruce, Cynthia A. Heide, Robert L. Hicks,
and Hortense Wells, individually and as members of the
Norfolk School Board, Albert Ayers, individually and in his
capacity as Superintendent of Norfolk Public Schools; H.A.
Carter, individually and in his capacity as Supervisor of
Special Education Transportation for Norfolk Public Schools;
Paul H. Smith, individually and in his capacity as
Assistant Superintendent for Business and Finance Support
Services for Norfolk Public Schools, Appellees.
 No. 83-2106.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 29, 1984.
Decided Feb. 15, 1985.
 
 Alfred W. Bates, III, Tidewater Legal Aid Soc., Norfolk, Va., for appellant.
 Harold P. Juren, Deputy City Atty., Norfolk, Va. (Philip R. Trapani, City Atty., Daniel R. Hagemeister, Deputy City Atty., Norfolk, Va., on brief), for appellees.
 Before WIDENER, PHILLIPS and WILKINSON, Circuit Judges.
 JAMES DICKSON PHILLIPS, Circuit Judge:
 
 
 1
 Phyllis Rodgers appeals from a judgment of the United States District Court for the Eastern District of Virginia in favor of appellees Norfolk School Board, et al., on Rodgers' claims of due process violation and breach of her employment contract in connection with the Board's 1982 termination of Rodgers' employment as a school bus driver. Concluding that Rodgers was afforded the process constitutionally due her, we affirm.I
 
 
 2
 Rodgers was employed by the Norfolk Public School System as a bus driver from August 1980 until her suspension in November 1981. She was assigned to drive Bus V-97, which transported emotionally disturbed children to and from Stuart School in Norfolk, Virginia. Appellant's sister Ray Rodgers was hired as a bus aide on Bus V-97.
 
 
 3
 Late in the afternoon of November 12, 1981, Harold Carter, Supervisor of Special Education Transportation for the Norfolk school system received a telephone call from Robert Thebarge, a student assigned to Bus V-97. Thebarge told Carter that the Rodgers sisters had had a fight in front of the children on the bus that afternoon, and at least one of the women had brandished a knife in the course of the fight. Thebarge said he was scared to ride the bus again.
 
 
 4
 Shortly thereafter on that same afternoon a mother of another student assigned to Bus V-97 called Carter and reported that her daughter had told her about a knife fight on the bus that afternoon. Carter then called the Rodgers sisters by telephone and told them to come to his office the next morning, that someone else would drive their bus.
 
 
 5
 On the morning of November 13, 1981, Carter went first to the Stuart School and interviewed three of the children involved. He then went back to his office to meet the Rodgers sisters. The sisters' immediate response was total denial and a request to know which children were accusing them. They were told the students' names.
 
 
 6
 Carter believed the children rather than the women. In the November 13 conference in his office Carter informed Phyllis Rodgers that he was suspending her pending the outcome of a formal investigation by the Department of Pupil Personnel, and he followed up by mailing Rodgers a letter saying he was recommending her termination and that she was suspended without pay pending termination effective immediately. The letter notified Rodgers that she had a right to a review of Carter's action, and that she had ten days to notify his office in writing that she wanted to exercise that right. The Rodgers sisters requested in a letter of November 19 that they be reinstated. Sam Ray, Deputy Superintendent responded on November 23 with a letter telling Rodgers to call Paul Smith, Assistant Superintendent, if she wanted her case reviewed. She did call Smith, and a meeting was set for December 18 between the Rodgers and Norfolk school officials.
 
 
 7
 In the meantime, Anthony J. Calabro, Coordinator, Pupil Personnel Services, conducted the in-house investigation requested on November 13 by Carter. Calabro interviewed everyone involved and on December 11 filed a written report that was essentially a finding of facts.
 
 
 8
 On December 18 the Rodgers sisters met with Carter, Assistant Director of Personnel William McBride, and Assistant Superintendent Paul Smith. Smith conducted the meeting. Carter gave his account and the Rodgers sisters in response gave theirs, maintaining their absolute denial of the entire episode. The Rodgers sisters brought no attorney to the meeting with them, and they were not permitted to confront and cross-examine the students whose reports had triggered the investigation.
 
 
 9
 At this meeting Smith asked Phyllis Rodgers if she would take a polygraph. She agreed. On January 7, 1982, she took the test and failed. As a result of the accumulated evidence in the case Smith wrote Phyllis Rodgers on January 11, 1982, informing her that he was recommending her termination to the Norfolk School's Superintendent, Albert Ayers. Ayers independently reviewed the case and in a letter of January 13, 1982, informed Rodgers that he would recommend her termination to the school board. On January 21, 1982, the Norfolk school board approved Ayers' recommendation and terminated Rodgers.
 
 
 10
 The Rodgers sisters then brought this action challenging their discharge on the basis of unlawful discrimination, violations of due process, breach of contract and defamation. After discovery the plaintiffs dropped all charges other than Phyllis Rodgers' due process claim and her claim for damages for breach of her employment contract. This effectively removed Ray Rodgers from the litigation. The case was tried to a jury which returned a verdict for defendant on both counts. This appeal followed.
 
 II
 
 11
 On appeal Rodgers makes three claims. First, she claims the district court erred in submitting her due process claim to the jury without first determining as a matter of law what process was due appellant prior to her discharge. Next, she contends that the application in her case of the Norfolk public schools' discharge procedure for classified employees did not accord her the process constitutionally due her. Finally, she claims that her discharge was actually subject to the Norfolk public schools' personnel grievance procedure, and that the failure to make that procedure available to her in this instance violated her due process rights as a matter of law.
 
 
 12
 The Norfolk schools have conceded throughout that Rodgers had a protected property interest in continued employment for the balance of her nine month contract. There is, accordingly, no dispute as to her right to some form of procedural due process incident to termination of her employment. Solely at issue is the form the required process had to take.
 
 
 13
 As a preliminary matter, Rodgers is technically correct that the ultimate issue of whether the termination procedures accorded Rodgers comported with due process was an issue of law for the court to determine. However, the district court's action in submitting the general issue of whether, on the evidence adduced, Rodgers was denied the process due her, hence was deprived of property without due process of law, did not constitute reversible error here. Because there was no factual dispute on the essentials of what transpired in the procedures leading to the termination, the question of whether due process was accorded was determinable as a matter of law. And because we conclude that on the undisputed facts there was no denial of procedural due process, the district court properly entered judgment for the defendants on the jury's verdict. Fed.R.Civ.P. 61. Our reasons for this dispositive conclusion are as follows.
 
 
 14
 Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), mandates a three-part balancing test when considering due process challenges to governmental deprivations of protected property and liberty interests.[1] Mathews noted that due process required "some form of hearing" " 'at a meaningful time and in a meaningful manner,' " citing Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965), and set forth three considerations to be balanced:
 
 
 15
 [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 424 U.S. at 335, 96 S.Ct. at 903.[2]
 
 16
 There is no question that Rodgers' interest in the remainder of her employment contract was a substantial one. We cannot, however, accept her contention that her interest was equal in degree to the "brutal need" of the welfare claimant in Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Instead her interest is more akin to that of the terminated federal employee in Arnett v. Kennedy, 416 U.S. 134, 169, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974) (Powell, J., concurring), and in Rosewitz v. Latting, 689 F.2d 175, 177 (10th Cir.1982), in both of which cases the lesser degree of the employment interest was specifically noted.
 
 
 17
 The risk of erroneous deprivation through the procedures used in Rodgers' termination was slight. Rodgers was given specific notice of the charges against her in her November 13 meeting with Carter and an explanation of the evidence against her. Rodgers was then given not one, but two opportunities to contest the charges, first in the November 13 meeting with Carter, and then in the December 18 review of her suspension. She was therefore given nearly a month to marshal facts and evidence before review of her suspension. Although Rodgers was not given advance notice of her right to have an attorney present at her review hearing, there is uncontradicted evidence that she was informed of that right immediately before the review, and in fact would have been allowed to have a lawyer with her at the review hearing if she had brought one. Rodgers failed the polygraph test provided her by the school system and voluntarily taken by her.
 
 
 18
 Rosewitz is instructive on the adequacy of the procedures in these respects. There the government employee had been provided a post-termination nonadversarial hearing before a grievance review board. She was given an opportunity to explain herself to the board but she was not allowed to see four written statements by former co-workers entered against her, nor was she allowed to confront and cross-examine witnesses against her. Her lawyer was excluded from the hearing. The Tenth Circuit nonetheless upheld the termination procedure as comporting with due process, holding:
 
 
 19
 [s]ince plaintiff was given clear notice of the alleged misconduct for which she was terminated, a reasonable time to marshal facts and evidence, an explanation of the evidence supporting the discharge, and an opportunity to present her version of the case to an impartial grievance board, the risk of erroneous deprivation was not great.
 
 
 20
 689 F.2d at 177. We agree with that analysis and find it applicable to the procedures here provided.
 
 
 21
 Rodgers specifically urges that she was due the additional procedural safeguard of confrontation and cross-examination of the children who accused her. In the circumstances of this case we cannot agree with that contention. In her November 13 meeting with Carter, Rodgers not only had the accusations explained to her, she also was informed of her accusers' identities. She therefore had a fair opportunity to account for any particular animosities her now-known accusers may have had towards her that would have led them to make unfounded accusations against her, but this she failed to do in any convincing manner. In the overall context of the procedures accorded Rodgers, the further safeguards against erroneous deprivation that direct confrontation would have provided do not warrant holding it an indispensable element of due process, given the obvious countervailing risks of emotional trauma for the children involved.
 
 
 22
 Green v. Board of School Commissioners of the City of Indianapolis, 716 F.2d 1191 (7th Cir.1983), is particularly relevant on this point. In Green, a school bus driver was terminated for sexually harassing a number of girls assigned to his bus. He challenged his termination on due process grounds claiming he had unjustly been denied the opportunity to attack the credibility of the girls who accused him. In the termination proceedings Green had been allowed to read and respond to written statements by the girls (from which their names had been excised for the purposes of the termination proceedings), but he was not permitted to confront the children personally.
 
 
 23
 The Seventh Circuit upheld the termination procedures and the lack of confrontation under the circumstances. The court noted the girls' fear of Green, their anticipated embarrassment at recounting his sexual advances to a room full of strangers, and the compensating fact that the written statements were taken down individually by police investigators to avoid collusion and reviewed by the child's parents in the presence of the child and the investigator.
 
 
 24
 We think the same considerations apply here to negate the right to confrontation that in other contexts not similarly fraught with countervailing risks to child-accusers and not protected by adequate alternative procedures might well be considered so fundamental as to be an essential element of procedural due process. See Goldberg, 397 U.S. at 267-68, 90 S.Ct. at 1020-21; Morris v. City of Danville, 744 F.2d 1041, at 1047 (4th Cir.1984), citing Thomas v. Ward, 529 F.2d 916 (4th Cir.1975) and McNeill v. Butz, 480 F.2d 314 (4th Cir.1973).
 
 
 25
 The third aspect of the Mathews inquiry into the adequacy of challenged procedures looks to the government's interest, including the burden on the government of any additional procedure. In Arnett Justice Powell noted that "the Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial." 416 U.S. at 168, 94 S.Ct. at 1651. In Rosewitz the Tenth Circuit noted that the government in that case had an "important interest" in efficient functioning of the city machinery "which may be impeded by imposing a requirement of adversarial, trial-like hearings for every discharged employee." 689 F.2d at 177.
 
 
 26
 This case presents not only the administrative considerations highlighted in Rosewitz, but the even more pressing governmental interest suggested by Justice Powell in Arnett. The Norfolk school system not only has a legitimate interest in the efficient administration of its personnel policies, but an obviously weighty interest in expeditiously removing employees who recklessly endanger the physical and emotional health of handicapped children the public has placed in their care.
 
 IV
 
 27
 In Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972), the Supreme Court pointed out that "due process is flexible and calls for such procedural protections as the particular situation demands." Applying the three-prong Mathews test to the situation indisputably revealed here, we hold that due process required only that Rodgers be given notice of the charges against her, including a general summary of the evidence available to support the charges, reasonable time to marshal facts and evidence to meet the charges, and an opportunity to be heard in a meaningful manner in rebuttal, avoidance, or justification of the conduct charged. We further hold that here, as a matter of law, Rodgers was accorded the process due her in this situation. By this we specifically reject her contentions that in addition to the procedures accorded her, she was entitled to have specific advance notice that an attorney might represent her at the termination proceeding and to confront and cross-examine her child-accusers.[3]
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 Although the Mathews test was announced in the context of termination of social security benefits, the court's analysis was not limited to that particular context. Later Supreme Court cases have applied the Mathews analysis to procedural due process issues in "such diverse areas as public education, licensing, customer relations practices of publicly-owned utilities, the placement of persons of various statuses in mental hospitals, parole release, and the creating and termination of parent-child relationships." Jackson, Risk of Error Analysis, 14 U.Tol.L.Rev. 1, 3 (1982). See also Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983) (applying Mathews test to transfer of prisoner from general prison population to isolation); Rosewitz v. Latting, 689 F.2d 175 (10th Cir.1982), (applying Mathews test to postal employee termination proceedings)
 
 
 [2]
 See also Arnett v. Kennedy, 416 U.S. 134, 164, 94 S.Ct. 1633, 1649, 40 L.Ed.2d 15 (1974) (Powell, J., concurring) (test applied to federal employee termination claim)
 
 
 [3]
 We also reject Rodgers' contention that the defendants' failure to follow the grievance procedures provided by the school system's employee handbook denied her procedural due process. Aside from a substantial question whether the cited procedures applied by their terms to terminations as opposed to working conditions and activities, state procedures do not define in detail the requirements of federal due process, which we have found met here. See, e.g., Siu v. Johnson, 748 F.2d 238, 244 (4th Cir.1984); Detweiler v. Commonwealth of Virginia Department of Rehabilitative Services, 705 F.2d 557, 561 (4th Cir.1983)