Thomas BRADLEY; Brenda Bradley,
Plaintiffs–Appellants,

v.

COLONIAL MENTAL HEALTH and RE-
TARDATION SERVICES BOARD;
Marilyn Duguid, Individually and in
her official capacity as Executive Di-
rector of the Colonial Mental Health
and Retardation Services Board; Har-
ris W. Daniel, Individually and in his
official capacity as Executive Director
of the Colonial Mental Health and Re-
tardation Services Board; Fred Mitch-
ell, Individually and in his official ca-
pacity as Substance Abuse Program Di-
rector of the Colonial Mental Health
and Retardation Services Board, De-
fendants–Appellees.

Thomas BRADLEY; Brenda Bradley,
Plaintiffs–Appellees

v.

COLONIAL MENTAL HEALTH AND
RETARDATION SERVICES BOARD;
Harris W. Daniel, Individually and in
his official capacity as Executive Di-
rector of the Colonial Mental Health
and Retardation Services Board; Fred
Mitchell, Individually and in his offi-
cial capacity as Substance Abuse Pro-
gram Director of the Colonial Mental
Health and Retardation Services Board,
Defendants–Appellants,

and

Marilyn Duguid, Individually and in her
official capacity as Executive Director
of the Colonial Mental Health and Re-
tardation Services Board, Defendant.

Nos. 87–3093, 87–3094.

United States Court of Appeals,
Fourth Circuit.

Argued March 8, 1988.

Decided Sept. 19, 1988.

Martin Kevin Griffin, Williamsburg, Va., (Parker & Lytle, on brief), for plaintiffs-appellants.

Eva Susan Tashjian–Brown (Scott S. Cairns, McGuire, Woods, Battle & Boothe, Richmond, Va., on brief), for defendants-appellees.

Before PHILLIPS and SPROUSE, Circuit Judges, and BRITT, Chief, United States District Judge for the Eastern District of North Carolina, sitting by designation.

SPROUSE, Circuit Judge:

Thomas and Brenda Bradley appeal from the district court's entry of summary judgment in favor of their former employer, the Colonial Mental Health and Retardation Services Board (the Board), in their 42 U.S.

C. § 1983 action alleging wrongful discharge in violation of the due process clause of the fourteenth amendment. The Board terminated the Bradleys' employment as mental health workers [1] after concluding they had abused three female clients. The trial court ruled that the Board's four-step grievance review procedure, which the Bradleys invoked and exhausted, satisfied the requirements of due process. We affirm.

I.

A.

Thomas and Brenda Bradley are husband and wife, and both were employees in the substance abuse services department at the Board-operated [2] Colonial Mental Health and Retardation Services Center (the Center) in York County, Virginia.[3] They were dismissed from their positions in September 1985 following the Center's receipt of sexual misconduct complaints from three former clients the Bradleys had counseled. In the first complaint, received in 1984, a female client stated that both Bradleys had engaged in sexual relations with her during the time she was undergoing treatment by Mr. Bradley. Thomas Bradley denied the allegation and his superior, Fred Mitchell, took no further action on it until the following year when he received two similar complaints.

In August 1985 Mitchell received a complaint that Thomas Bradley had dwelled upon sexually explicit topics during an initial intake interview with a prospective client. Mitchell subsequently obtained a written statement from the client in which she charged that Bradley had used obscenities and had made inappropriate comments concerning sex, nudity, erections, and vaginal lubrication during their initial meeting. She further stated that at the end of the

---

1. Thomas Bradley held the formal job title Substance Abuse Counselor, while his wife, Brenda, was a Substance Abuse Worker. Both jobs involved substantial client contact.

2. The Board is an agency of the Commonwealth of Virginia created pursuant to Va.Code Ann. §§ 37.1–194 to –202.1 (1984 & Supp.1987).

3. At all times pertinent to this appeal, Marilyn Duguid served as the Board's Chairperson, Harris Daniel was the Board's Executive Director, and Fred Mitchell was the Board's Substance Abuse Program Director.

interview Bradley pulled her close and embraced her.

At approximately the same time, Mitchell received a third complaint from a female client who had been treated by the Bradleys over an extended period. In a sworn and notarized statement, the client specified a range of sexual and other misconduct that the Bradleys had perpetrated on her both while she was under their treatment and for two years thereafter. According to the client's statement, Thomas Bradley had constantly demanded sex whenever they met, requiring her at times to succumb to his demands at the Center's facilities and at his home. She also stated that Brenda Bradley knew of and condoned her husband's activities and that both Bradleys ordered her to perform household chores for them. She stated she complied with the Bradleys' demands out of fear of retribution.

Upon receiving the latter two complaints, Mitchell reopened the file on the initial 1984 complaint and obtained a short written statement from the former client. The client alleged that she was involved sexually with Thomas and Brenda Bradley during the period when she was undergoing treatment at the Center and that the experience caused her emotional harm.

### B.

Fred Mitchell and the Board's director, Harris Daniel, conducted an investigation into the complaints lodged against the Bradleys. Their inquiry and the actions they took as a result of it were governed by rules and procedures set forth in an employee personnel manual that the Board had issued. The manual established "standards of conduct" applicable to all Center employees and a four-step grievance procedure the employees could invoke to resolve disputes with the Board.

The standards of conduct listed in the manual enumerated specific "offenses" and grouped them into three graduating levels of severity. Offenses of the first level, *e.g.*, unsatisfactory attendance and tardiness, were the least severe and would result in a discussion between the offending employee and his supervisor to be followed by a written notice of infraction if the problem was not corrected. If the employee received three such written notices within one year, he would be subject to a maximum three-day suspension from work. A fourth notice could result in termination. The commission of a second-level offense, *e.g.*, reporting to work under the influence of alcohol or illegal drugs, subjected the offending employee to a maximum five-day suspension on the first infraction. Any subsequent offense in this category allowed the Board to terminate the employee. Third-level offenses were the most serious. They warranted immediate discharge on "a first occurrence." Among the listed third-level infractions was "patient abuse."

At a meeting held September 5, 1985, Mitchell and Daniel informed the Bradleys that the Center had received complaints charging them with patient abuse. They were given notice of the nature of the charges against them and were suspended from work pending the outcome of an investigation.

On September 12, 1985, Mitchell and Daniel again met with the Bradleys. They revealed to the Bradleys the complainants' identities and specific allegations and gave the Bradleys an opportunity to respond to the complainants' allegations. The Bradleys denied engaging in sexual relations with the complainants during the time that the complainants were undergoing therapy, but refused to answer whether such relations had occurred after therapy was completed. The Bradleys also produced "love letters" they received from one of the clients, which they alleged proved that she was merely infatuated with Thomas Bradley. They admitted, however, that two of the clients had performed baby-sitting chores for them and that one had helped paint their house. Thomas Bradley further conceded that the facts alleged by the prospective client concerning his conduct during the intake interview were true.

Rejecting the Bradleys' denials, Mitchell and Daniel concluded that the clients' complaints were credible and that the Bradleys had not produced sufficient evidence to refute them or to impeach their veracity.[4] Accordingly, Mitchell and Daniel terminated the Bradleys' employment. Shortly following the terminations, Mitchell told the Bradleys' former coworkers in the substance abuse department that it would be in their best interest not to get involved with or speak to the Bradleys.

The Bradleys then invoked the four-step grievance procedure outlined in the Board's personnel manual. The first step in the procedure required the Bradleys to file a written protest of their terminations with their Program Director, Fred Mitchell. Mitchell denied their timely filed objections. In the second step of the process, the Bradleys presented their grievance in a personal meeting with the Board's Executive Director, Harris Daniel. Daniel upheld the Bradleys' termination, again finding that they had not adequately refuted the charges against them.

The third step of the grievance procedure involved a hearing before an Executive Committee, composed of Board Chairperson, Marilyn Duguid, and the other members of the Board. The Executive Committee upheld the Bradleys' terminations after hearing testimony from the Bradleys and Harris Daniel and examining the Bradleys' grievance files, which contained the statements of the former clients.[5] Although the clients did not appear as witnesses at the hearing and the Bradleys had yet to review copies of their actual statements, they conceded they were aware of the clients' identities and the specifics of their charges. Moreover, the Committee informed the Bradleys of their right to examine the statements, and it did not preclude them from calling witnesses. Finally, the Bradleys were permitted to have legal representation at the hearing, but they chose not to have counsel present.[6]

After receiving the Executive Committee's unfavorable decision, the Bradleys invoked the fourth and final step of the grievance process—a hearing before a Special Grievance Panel. The Panel was composed of three members, one selected by the Board, one chosen by the Bradleys, and the last picked by the Board's and the Bradleys' designated nominees. In the hearing before the Panel, the Bradleys, accompanied by counsel, were permitted to present evidence and to review the statements of the complaining clients.[7] Again,

4. They concluded, for example, that the "love letters" submitted in defense actually bolstered the veracity of that client's allegations.

5. In an opinion issued after the hearing, the Executive Committee wrote:

> The Executive Committee deliberated on the information you presented, the complaints of the three ex-clients, and the administrative actions taken by Mr. Fred Mitchell and Mr. Harris W. Daniel. The policies of the Services Board were also reviewed by the Executive Committee.
>
> The charges made against you by three unrelated individuals for sexual misconduct are well documented and clearly fall into the category of patient abuse. ... In the opinion of the Executive Committee, your unprofessional conduct has been damaging to all of the clients involved.
>
> These charges are of an extremely severe nature that endangers the purpose, mission, and credibility of the Services Board. It would have been negligent of the Administrative Staff; i.e., Mr. Mitchell and Mr. Daniel, to have taken action other than your dismissal. For these reasons it is the Executive Committee's unanimous decision that the policies of the Services Board were administered in a proper and fair manner and that your termination from employment was unequivocally justified.

6. It is undisputed, however, that the Bradleys consulted legal counsel prior to their terminations and during the first three steps of the grievance procedure. Their lawyer appeared with them at the final hearing before the Special Grievance Panel.

7. According to the Board's personnel manual, the Panel's jurisdiction was "confined to judging the Executive Director's and the Board's action in the administration of the policies, rules, and regulations of [the Board]." In its own words, the panel determined that its tasks in the grievance action were: 1) "[to] [d]etermine whether or not the Colonial Community Services Board complied with and administered fairly and reasonably its Grievance Procedure and Standards of Conduct;" and 2) "[to determine whether,] [b]ased on available information, ... the Colonial Community Services Board [took] reasonable action."

they made no request to call witnesses or to confront the accusing clients.[8] At the close of the hearing, the Panel unanimously affirmed the Board's action. In a short opinion issued afterwards, it wrote:

> The Grievance Panel finds that the Colonial Community Services Board acted reasonably and fairly in accordance with the Standards of Conduct and the Grievance Procedure.
>
> Based on information provided by the Colonial Community Services Board and the Grievant, there appears to be compelling information that patient abuse did occur.

Having exhausted the available grievance procedures, the Bradleys filed the present action in the district court. The Bradleys claimed that they were denied the right to confront their accusers and to cross-examine witnesses and that the procedures generally failed to satisfy the requirements of due process of law.

## II.

### A.

In *Board of Regents v. Roth*, 408 U.S. 564, 576–77, 92 S.Ct. 2701, 2708–09, 33 L.Ed.2d 538 (1972), the Supreme Court established the now well-settled rule that when a public employee has a legitimate claim of entitlement to continued employment, there exists a property interest in the employment that is protected by the due process clause of the fourteenth amendment. Such a property interest, the Court observed, must be identified and its contours defined by reference to a source independent of the constitution. *Id.* at 577–78, 92 S.Ct. at 2709–10.[9] Here, we agree with the district court that the standards of employee conduct set forth in the Board's personnel manual vested the Bradleys with a claim of entitlement to their continued employment that the fourteenth amendment insulates from arbitrary deprivation. The Virginia Supreme Court has recognized that contractual provisions protecting employees from termination without just cause establish employer obligations that are enforceable to prevent dismissal without cause. *Norfolk Southern Ry. Co. v. Harris,* 190 Va. 966, 59 S.E.2d 110, 114–15 (Va.1950).[10] We think the rationale of *Harris* fairly implies that the same obligation may arise when such provisions appear unambiguously in an employee manual and are accepted and relied upon by those from whom the employer reaps the fruit of con-

8. In their initial written requests for review by the Executive Committee each of the Bradleys stated "I have never seen a copy of the complaint made by the client or clients nor faced my accuser." Neither of them however asserted any desire for confrontation at the hearings.

9. A property interest may be created by statute, see *Detweiler v. Virginia Dep't of Rehabilitation Services,* 705 F.2d 557, 559–60 (4th Cir.1983), by written contract guaranteeing a fixed term of employment, *Perry v. Sinderman,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972), or by rules and mutually explicit understandings that support a claim of entitlement. *Id.* From whichever source a property interest is alleged to arise, of course, "the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).

10. In *Harris,* the Virginia Supreme Court expressed the governing principle as follows:

> It is settled doctrine in this State that where no specific time is fixed for the duration of an employment, there is a rebuttable presumption that it is an employment at will, terminable at any time by either party.
>
> Here, however, a definite time was fixed for the duration of the employment. It was, by the terms of the contract, to continue until the plaintiff gave to the defendant just cause to end it. The result of being discharged after long years of service in a particular occupation can well be serious. The defendant's agreement that it would not discharge plaintiff without just cause was a thing of value to him, a safeguard against the loss and embarrassment to be expected from an arbitrary discharge. The defendant's agreement that it would not be done was a term of plaintiff's employment, compensation for his work which he had earned along with his wages. The defendant ought not to take that promised reward from him without incurring a penalty for violating its agreement. It was a promise in return for services which the plaintiff performed and which furnished sufficient consideration for a binding contract. In such case the doctrine of mutuality is inapplicable.

59 S.E.2d at 114–15 (citations omitted).

tinuing labor.[11]

The personnel manual promulgated by the board intricately details the offenses that may subject an employee to discipline. The manual's specificity in that regard is matched only by its particularized description of the discipline that may be administered for the enumerated offenses. The ultimate sanction of dismissal on "a first occurrence" is limited to the most severe infractions, e.g., patient abuse. It specifies a range of more lenient disciplinary responses for lesser offenses, but it does not vest unlimited discretion in the Board to discipline its employees for any reason. While it is true that the manual states, "[t]he offenses listed in this Policy are not intended to be all inclusive," immediately following that sentence is language which completely contradicts the Board's position:

> Accordingly, conduct which in the judgment of the Services Board, although not listed, *seriously undermines the effectiveness of the organization's activities or the employee's performance* should be treated in a manner consistent with provisions of this Policy. (emphasis supplied).

This language requires a strong showing of deleterious misconduct before an employee may be disciplined for an unlisted infraction. Even if that standard were satisfied, it would remain the Board's obligation to consider the infraction consistently with the manual's listed offenses. Thus, in the majority of cases, the Board would be required to impose discipline far less permanent than outright dismissal.

These detailed provisions formed a part of the Bradleys' contract of employment. The right to be disciplined only in accordance with the manual's procedures was a valuable benefit conferred on the employees by the contract, placing substantive limitations on the Center's discretion to discipline them. We therefore agree with the district court that the Bradleys had a claim of entitlement to continuing employment that was protected by the fourteenth amendment. We also agree with the court, however, that they were afforded due process in the termination of their employment.

### B.

The Bradleys' claim of due process deprivation centers on their contentions that they were denied the opportunity to confront and cross-examine the accusing clients in the post-termination grievances procedures[12] and that the administrative tribunals reviewing their grievance were biased in favor of the Board.

■ First, there is no suggestion that the Bradleys were inhibited or otherwise restricted from securing the presence of the accusing clients. They were aware of the clients' identities, and nothing in the record suggests that they were inhibited from access to them. The Board considered the evidence presented by the investigating supervisor, the Bradleys' ad-

---

**11.** See *Thompson v. American Motor Inns, Inc.,* 623 F.Supp. 409 (W.D.Va.1985); *Barger v. General Electric Co.,* 599 F.Supp. 1154 (W.D.Va. 1984); *Frazier v. Colonial Williamsburg Foundation,* 574 F.Supp. 318 (E.D.Va.1983); *cf. Miller v. Sevamp,* 234 Va. 462, 362 S.E.2d 915 (1987) (oral statement did not create expectation of continued employment because it was superseded by terms of personnel manual); *Dulany Foods, Inc. v. C.M. Ayers,* 220 Va. 502, 260 S.E.2d 196 (1979) (employer memoranda established employees' right to severance pay).

We point out the obvious—the interpretation of employment contracts, employee handbooks and the like must take place on an *ad hoc* basis. Just as the mere availability of procedures does not create a constitutionally protected interest where no substantive limits are placed on discretion, *see Olim v. Wakinekona,* 461 U.S. 238,

250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983), the existence of a personnel manual is not a litmus test for due process. Each employment relationship must be examined carefully and individually to discern whether an employer has undertaken an objective obligation to which its employees may justifiably claim entitlement. Here, we are persuaded on the basis of such an evaluation that the Bradley's enjoyed a legitimate expectation of continued employment absent just cause for their removal.

**12.** There is no question that the Bradleys received adequate process in the Board's pre-termination procedures. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 545–46, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985); *see also Buschi v. Kirven,* 775 F.2d 1240, 1255–56 (4th Cir.1985).

mission of some obviously improper conduct concerning clients, and the clients' statements. In the absence of any attempt by the Bradleys to present evidence other than conclusory denials or to request the presence of their accusers, we do not think the Board had a unilateral duty to assist the Bradleys in the construction of their defense.[13]

In *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court established the now well recognized three-part balancing test for considering whether a governmental deprivation of a protected property or liberty interest violates due process. The Court stated that the following three considerations must be weighed:

> [F]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

■ Although the Bradleys' interests in continued employment were "substantial," *Rodgers v. Norfolk School Board,* 755 F.2d 59, 63 (4th Cir.1985), the risk of erroneous deprivation through the procedures employed here was minimal. The Bradleys were given four formal opportunities to contest their termination over the course of three months. They had more than ample time to marshal the facts in their favor and gather evidence. They consulted with counsel throughout the process, and counsel was present at the hearing before the Special Grievance Panel. They knew their accusers and were apprised of the specifics of the complaints against them. They were not restricted from presenting evidence or calling witnesses.[14] Given their status as former counselors to two of the clients, they were uniquely able to bring to the adjudicators' attention any and all impeachment information they acquired as a result of the relationship. Finally, they were aware from the beginning that the Board's principal reason for rejecting their grievance was the absence of evidence refuting the clients' charges. The record indicates, however, that they made no attempt in any of the grievance steps to present any evidence other than their own conclusory testimony.[15]

While not determinative of the outcome of this appeal, we are, of course, aware of the Board's interest in not subjecting these particular clients to the rigors of testimonial appearances when their presence was not requested by the accused employees.

13. See generally, *Satterfield v. Edenton–Chowan Board of Education,* 530 F.2d 567, 572 (4th Cir. 1975) (determination of whether due process is satisfied depends upon "what rights were accorded the plaintiff at the hearing and what objections, if any, were made at that hearing by the plaintiff or his counsel"); *Fuller v. Laurens County School Dist. No. 56,* 563 F.2d 137, 140 (4th Cir.1977) (waiver of elements of due process in termination procedures precludes future claims of due process deprivations).

14. Relying on *Detweiler v. Virginia Dep't of Rehabilitative Services,* 705 F.2d 557, 561–62 (4th Cir.1983), the Bradleys claim that due process was denied because their superiors at the Center instructed coworkers not to talk with the Bradleys during the pendency of their grievance. In other circumstances this would present a legitimate contention, but here *Detweiler* is distinguishable. *Detweiler* was decided on a motion to dismiss, and the question presented was whether an allegation that prospective favorable witnesses were intimidated stated a claim for deprivation of due process. The present case was decided on a summary judgment motion, and the question presented was whether the Bradleys had provided evidence sufficient to raise a question for the trier of fact over whether a due process violation had occurred. The Bradleys made no showing that the Center's instructions actually intimidated prospective witnesses from coming forward with evidence to rebut the clients' allegations. Moreover, Thomas Bradley conceded in deposition testimony that his coworkers at the Center possessed no information that would have helped him defend against the clients' charges. Therefore, while we do not condone the Center's conduct, we cannot say that it was prejudicial to the Bradleys in this case.

15. Thomas Bradley admitted the allegations of the third client with respect to the intake interview.

Each of them had undergone treatment at the Center and their written statements suggest the emotional distress they suffered as a result of their relationship with the Bradleys. It is not necessary to reach the questions whether the clients' vulnerability was sufficient in itself to justify their absence from the hearing or whether their absence would have been justified had the Bradleys requested that they be present. The Bradleys made no direct request that they be present and never objected to their absence. Under the circumstances the clients' potential emotional vulnerability was a factor which at least could be weighed by the Board in their decision on the question of requiring their live testimony. *Cf. Rodgers,* 755 F.2d at 63–64; *Green v. Board of School Commissioners,* 716 F.2d 1191, 1193 (7th Cir.1983).

■ We find little merit in the Bradleys' allegation of bias against the members of the Executive Committee and the Special Grievance Panel. They contend that the possibility the complaining clients would publicize their complaints or initiate a lawsuit against the Board compromised the adjudicators' impartiality. Beyond the fact that nothing but speculation supports the Bradleys' argument, it remains undisputed that the Bradleys chose one of the three members of the Special Grievance Panel, who, along with the Board's nominee, selected the third panel member. Moreover, as we stated in *Morris v. City of Danville,* "[a]dministrative decision makers, like judicial ones, are entitled to a presumption of honesty and integrity, ... and absent a showing of bias stemming from an extrajudicial source, they are not constitutionally precluded from making the determination that they are directed to make by their employer." 744 F.2d 1041, 1045 (4th Cir. 1984) (citation omitted). Here, the Bradleys made no showing of bias stemming from a source outside of the evidence presented in their grievance proceedings.

Finally, we find no abuse of discretion in the district court's denial of attorneys' fees to the Board. See *Bernstein by Bernstein v. Menard,* 728 F.2d 252, 254 (4th Cir.1984).

In view of the above, the judgment of the district court is affirmed.

AFFIRMED.