# United States Court of Appeals
## For the First Circuit

No. 07-2501

EDWIN OTERO-BURGOS, NIEVELYN MARRERO-PEÑA,
CONJUGAL PARTNERSHIP OTERO-MARRERO,

Plaintiffs, Appellants,

v.

INTER AMERICAN UNIVERSITY, IRENE FERNÁNDEZ-APONTE,
JUAN NEGRÓN-BERRÍOS, A-Z INSURANCE COMPANIES,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Charles S. Hey-Maestre, with whom Manuel Moraza-Choisne, Adalina de Jesús Morales, and Manuel Moraza-Ortiz were on brief, for appellants.
Seth A. Tucker, John E. Bies, and M. Ryan Calo on brief for American Association of University Professors, amicus curiae.
Raul S. Mariani-Franco and Guillermo J. Ramos Luiña on brief for Asociación de Profesores y Profesoras del Recinto Universitario de Mayagüez (APRUM) and the Former President of Inter American University, Ramón A. Cruz, Ph.D., amici curiae.
Amancio Arias-Guardiola for appellees.
Arturo Díaz Anqueira, Lillian T. De La Cruz-Torres, Roberto Feliberti, and Victoria D. Pierce-King on brief for Ana G. Méndez University System, amicus curiae.

February 19, 2009

**LIPEZ, Circuit Judge.** This case requires us to decide whether Puerto Rico Law 80, which provides a severance pay remedy for an employee "contracted without a fixed term, who is discharged from his/her employment without just cause," applies to a university professor who claims to have been terminated in violation of his tenure contract. Appellee Inter American University ("IAU" or "the University"), a private educational institution, argues that the tenure contract at issue here is a contract "without a fixed term," and is subject to Law 80 and its exclusive severance pay remedy. Appellants Professor Edwin Otero-Burgos and his wife, Nievelyn Marrero-Peña, contend that the tenure contract does have a fixed term. Therefore, Law 80 does not apply and does not bar their claim for breach of contract.

The appellants filed suit against IAU and several University officials, alleging, inter alia, breach of contract and employment discrimination.[1] After initially denying appellees' motion for summary judgment on the breach of contract claim, the district court granted their request to reconsider the matter and issued an Amended Partial Judgment which set aside its earlier ruling and dismissed the claim with prejudice on the basis of Law 80. For the reasons set forth below, we vacate the district court's order dismissing Otero-Burgos's breach of contract claim.

---

[1] Because Marrero-Peña's claims are derivative of her husband's, we will refer solely to Otero-Burgos as the plaintiff/appellant.

## I.

### A. Factual Background

Although we are not ruling on the merits of Otero-Burgos's claim, we provide the background to this dispute for context. At the time of his termination in 2003, Otero-Burgos had worked at IAU for nearly three decades, most of them in the Business Department. He was first employed by the University in an administrative capacity in 1974. Over a period of twenty years, he occupied various teaching and administrative positions, until he was awarded tenure effective August 1, 1994. As a professor, Otero-Burgos consistently enjoyed positive evaluations from students and faculty alike, and he received numerous awards and honors for his contributions to the University, including the award of "Distinguished Professor" in 1996.[2]

In the fall of 1999, Otero-Burgos taught a course on business theory at the Barranquitas campus of IAU. One student enrolled in the class, Gilberto Berríos-Blanco, received a "D" as his final grade for the semester. Unhappy with this result, the student met with Otero-Burgos and asked for an opportunity to improve his grade. The professor denied this request.

---

[2] According to section 2.3.3 of the IAU Faculty Handbook, this title is "usually assigned to faculty members who have rendered outstanding and widely recognized service at the University or at another institution of higher education and have served with distinction in other areas of society." These individuals must "clearly indicate an ability to contribute significantly to the academic progress of the University." Id.

On March 28, 2000, the student filed a complaint with the Dean of Academic Affairs,[3] Juan A. Negrón-Berríos, accusing Otero-Burgos of a number of unfair grading practices and alleging other irregularities in the way the course had been taught and administered. The student's chief complaint was that Otero-Burgos had inappropriately changed the course syllabus mid-semester by eliminating one of the previously scheduled exams and instead giving more weight to the students' grades on a group project. Berríos-Blanco argued that he had been unfairly prejudiced in two ways: first, because he did not participate in the group project, which turned out to have unexpected significance for his grade in the course, and second, because the cancellation of the exam deprived him of an opportunity to improve his performance.

On April 5, 2000, Otero-Burgos discussed the situation with Negrón-Berríos. After this meeting, Otero-Burgos wrote a detailed letter to Negrón-Berríos, rebutting the aggrieved student's allegations of impropriety and unfairness and setting forth his own position on the matter. The dean rejected the professor's explanations and instead sent Otero-Burgos written instructions to devise a supplemental exam or project that would enable the student to make up the missing points. When Otero-Burgos once again refused, Negrón-Berríos referred the matter to

---

[3] The Faculty Handbook and the parties use the terms "Dean of Studies" and "Dean of Academic Affairs" interchangeably. For consistency, we will use the latter.

María H. Ramos, Director of the Department of Business Administration, the department to which Otero-Burgos belonged.

Professor Ramos, in turn, involved IAU's attorney, Vladimir Román. After her consultation with the attorney, Ramos sent Otero-Burgos a letter offering him two options. Otero-Burgos could either prepare a supplemental "evaluation instrument" which would allow the student to earn the missing points, or the department would appoint another professor to prepare a similar instrument. Otero-Burgos refused to devise the supplemental evaluation. On the advice of IAU's attorney, Negrón-Berríos selected another professor to design and administer a supplemental evaluation. The student's grade was subsequently changed to a "C" at the direction of Negrón-Berríos and appellee Irene Fernández-Aponte, chancellor of IAU's Barranquitas campus.

On May 29, 2000, Otero-Burgos filed a complaint with the Faculty Appeals Committee[4] for the academic year 1999-2000,

---

[4] The Faculty Handbook Provides:

At each instructional unit the Committee on Faculty Appeals consists of five (5) members. Two (2) are appointed by the chief executive officer, two (2) by the faculty of the instructional unit and the fifth (5th) is chosen by these four (4) from among the faculty members. Once constituted, the Committee elects its president. Members selected cannot belong concurrently to another committee related to contractual procedures for teaching personnel. One term of appointment or election is for two (2) years. . . . The Committee hears appeals after all resources in the administrative process have been exhausted. Appeals include the violations to the rights and prerogatives recognized in this Handbook, as set

claiming that the University administration had violated his academic freedom.[5]  The professor's letter recounted the relevant events and included both a general exposition of the teaching methodology he had employed in the business theory course and a specific defense of his actions in connection with the student complaint.  Because the academic year was at an end, the Committee deferred consideration of the matter to the 2000-2001 Faculty Appeals Committee.[6]

During the fall of 2000, the Faculty Appeals Committee held a series of "extraordinary meetings" to consider Otero-Burgos's grievance.  Both Ramos and Negrón-Berríos spoke to the Committee, which ultimately concluded, in a 3-1 opinion dated May 4, 2001, that the "imposition of the suggested alternatives made by the Legal Division and put into practice by these [sic] would pose

forth in Part IV, section Grievance Procedure. IAU Faculty Handbook, § 1.9.2.5.

[5]  The rules governing the Committee's consideration of such complaints are set forth in section 4.2 of the IAU Faculty Handbook, entitled "Grievance Procedure."

[6] Otero-Burgos was a member of the Faculty Appeals Committee for both the 1999-2000 and 2000-2001 academic years.  This prompted Hilda Ortiz, President of the 1999-2000 Faculty Appeals Committee, to write a letter to the other members, instructing them that Otero-Burgos should not be permitted to intervene in the evaluation of his own complaint. Otero-Burgos did not vote on his claim, and the University's allegations -- disputed by Otero-Burgos -- that his participation in the Committee's business was improper are irrelevant for present purposes.

a violation to Prof. Edwin Otero Burgos' right to academic freedom to lecture and teach."

On June 15, 2001, Chancellor Fernández-Aponte wrote a letter to the Faculty Appeals Committee, stating that she considered Otero-Burgos's academic freedom claim to be meritless. She added, "I understand that the claim of a violation to his academic freedom does not proceed. I hope this matter is considered a finished matter."[7]

Upon learning of the chancellor's letter, Otero-Burgos, invoking section 4.2 of the Faculty Handbook, responded by appealing to IAU President Manuel J. Fernós, in a letter dated November 8, 2001. Otero-Burgos once again accused IAU of violating his right to academic freedom under the Handbook and described several ways in which the chancellor's intervention was inappropriate in light of the grievance procedure set forth in the Handbook. Finally, the professor requested several specific "remedies" in connection with his grievance, including the reinstatement of Berríos-Blanco's original "D" grade, a letter

_____

[7] Under the Grievance Procedure outlined in the Faculty Handbook, the aggrieved faculty member and the Dean of Academic Affairs each have fifteen days in which to appeal a decision of the Faculty Appeals Committee to the chief executive officer of the relevant campus (here, Chancellor Fernández-Aponte). See Handbook §§ 4.2, 1.8.3.1. "The chief executive officer of the unit may uphold or modify the decision of the Faculty Appeals Committee or make the decision that, according to his judgment, is appropriate. . . . This decision may only be revised by the President of the University." Id. at § 4.2.

ratifying the decision of the Faculty Appeals Committee, a warning letter to Dean Negrón-Berríos for his alleged "defamation" of Otero-Burgos, and a warning letter to Chancellor Fernández-Aponte for her failure to follow the procedures in the Faculty Handbook. In response, Fernández-Aponte wrote her own December 5, 2001 letter to President Fernós, rebutting these charges and asking him to take the necessary "relevant action."[8]

Meanwhile, in a separate proceeding pursuant to section 5.9.9 of the Handbook, Dean Negrón-Berríos selected three professors who would comprise an Ad Hoc Committee charged with reviewing the performance of the Faculty Appeals Committee and, more generally, the performance of Professor Otero-Burgos.[9] Chancellor Fernández-Aponte sent a letter to Otero-Burgos,

---

[8] In fact, Fernós took no action until months later – after Otero-Burgos had already been terminated as a result of the proceeding initiated by the Ad Hoc Committee. See infra.

[9] This section provides:

When there are sufficient reasons to suspect that a faculty member has incurred in [sic] any of the behaviors specified above or if, on the other hand, there are reasons that may justify dismissal or the imposition of disciplinary sanctions, the academic officer with highest rank under the chief executive officer of the academic unit will appoint an ad hoc inquiry committee that will include faculty and administrative representatives who will conduct the investigation and advise him. If the committee finds adequate cause for dismissal or the imposition of other disciplinary measures, the committee will prepare a written statement of reasons for dismissal that, in its judgment, justify dismissal or the imposition of any other disciplinary sanction.

notifying him that an Ad Hoc Committee had been appointed to commence an investigation because "it ha[d] been determined, in a preliminary manner, that [Otero-Burgos's] action probably constituted a violation" of numerous provisions of the Handbook.

After an inquiry that lasted several months, the Ad Hoc Committee issued its Final Report in June 2002. The Committee found, inter alia, that Otero-Burgos had been insubordinate; violated faculty rules, institutional policies, or operational norms of the University; violated the rights of his faculty colleagues, the administration, and his students; and breached the contract between the University and a student. Citing these infractions (most of which constitute "just cause" for the dismissal of tenured faculty under the Handbook), the Ad Hoc Committee recommended the "permanent and definite" termination of Otero-Burgos's contract with IAU.[10]

---

[10] Section 5.9.9 of the Faculty Manual provides, in relevant part:

> Dismissal is the severance action by which Inter American University ends its contractual relationship with a tenured faculty member, or a faculty member with a probationary, temporary, or substitute appointment, before the expiration of his contract.

> The cause that justifies dismissal must be directly and substantially related to the fitness of the faculty member to continue in his professional capacity as teacher. Dismissal proceedings may be instituted for any action that affects the proper and normal operation of the University. Although not limited to these, the following actions may be considered as affecting the proper and normal operation of the University . . . .

On August 16, 2002, in a letter from Dean Negrón-Berríos, IAU formally notified Otero-Burgos that his employment had been terminated. The letter informed the professor that, in accordance with section 5.9.9 of the Handbook, his termination was primarily due to "Inappropriate conduct" and "Non-compliance or violation of the Faculty Regulations, the Institutional Policies or the Operational Norms of the Institution."[11]

On August 30, 2002, in a meeting with Dean Negrón-Berríos, Otero-Burgos continued to insist that he had not violated IAU's rules and regulations and therefore that he was unjustly dismissed. Unable to persuade the dean, Otero-Burgos appealed his dismissal to the Faculty Appeals Committee for 2002-2003, which was now comprised of five entirely different members than the 2001-2002 Committee that had reviewed his first grievance.[12] The new Committee held hearings on the matter in

---

The manual proceeds to list eight grounds for dismissal.

[11] Days later, in a letter dated August 27, 2002 (more than nine months after Otero-Burgos had originally contacted him), IAU President Fernós wrote a letter informing appellant's counsel of his decision to sustain the chancellor's decision on Otero-Burgos's earlier grievance. Fernós had determined that "Otero-Burgos's academic freedom ha[d] not been violated."

[12] Pursuant to section 5.9.9 of the Handbook, if a faculty member is dismissed or subjected to any other disciplinary action, he may petition the Faculty Appeals Committee in writing, requesting review of the decision and setting forth the reasons for which the adverse action against him must be revoked. The Committee "may decide that the disciplinary action be sustained, that it be modified, or that it be dropped."

October 2002, once again following the procedure outlined in section 4.2 of the Handbook. After completing its investigation, the Faculty Appeals Committee issued a written decision stating that, because the Committee "did not find a cause to justify a termination," it had concluded that "Professor Edwin Otero-Burgos must be reinstated in his position as [a] member of the faculty of the Barranquitas Campus with his respective salary and vested benefits he had as of August 17, 2002."

On February 23, 2003, Chancellor Fernández-Aponte again overruled the Committee and sustained Otero-Burgos's dismissal.[13] Finally, in response to another appeal from Otero-Burgos, IAU President Fernós ratified the professor's termination. After his dismissal, Otero-Burgos moved to Ohio, where he had found a new job. Therefore, diversity is the basis for our jurisdiction.

## B. Procedural History

Otero-Burgos first brought suit in June 2004, alleging breach of contract and age discrimination by IAU. The breach of contract claim, based on various provisions of the Puerto Rico Civil Code, sought both damages and specific performance - i.e., reinstatement. Otero-Burgos brought his age discrimination claim under Puerto Rico Law 100, P.R. Laws Ann. tit. 29, § 146,

---

[13] Section 5.9.9 of the Faculty Handbook provides that "[t]he chief executive officer of the unit may sustain the decision of the Committee on Faculty Appeals or modify it by taking the decision he may deem appropriate."

accompanied by two derivative tort claims under Puerto Rico Civil Code §§ 1802 and 1803.

Defendants filed a motion for summary judgment on all counts. After initially denying summary judgment on the breach of contract claim and dismissing the age discrimination claim, the court agreed to reconsider its ruling on the contract claim in response to a motion filed by IAU. In its second opinion, the court adopted an argument that IAU had advanced for the first time in its motion for reconsideration: that Otero-Burgos's exclusive remedy for unjust dismissal was the severance pay provided by Puerto Rico Law 80.[14] Accordingly, the court held that Otero-Burgos's contract claim was precluded,[15] and ordered him to file an amended complaint framing the allegations of unjust dismissal as a Law 80 claim. Otero-Burgos initially refused to dismiss the breach of contract claim. Eventually, however, he filed a Third Amended Complaint that contained a Law 80 count but omitted the breach of contract allegations. Pursuant to an agreement between the parties anticipating this appeal, the district court entered final judgment

---

[14] Law 80, P.R. Laws Ann. tit. 29, §§ 185a-185m, discussed in greater detail infra, provides compensation for covered employees who have been dismissed without "just cause" within the meaning of the statute. The amount an employee may recover is determined by a formula set forth in the statute.

[15] The district court also reinstated the age discrimination claim but dismissed causes of action for unjust discharge against the individual defendants, holding that Law 80 did not allow for such liability.

dismissing Otero-Burgos's age discrimination and tort claims with prejudice and the Law 80 claim without prejudice. This appeal followed.

## II.

Otero-Burgos challenges the district court's holding that Law 80 severance pay is his exclusive remedy for wrongful termination, regardless of the terms of his contract with the University. He argues that the district court improperly relied on cases involving non-tenured, private sector employees and ignored the special nature of the employment relationship described in his contract. Instead, citing the terms of his tenure contract, he asserts that he "is not in the same position [as] an employee of a supermarket, a bank, or a fast-food restaurant" for the purposes of Law 80. He claims that Law 80, in the absence of an employment contract, allows an employer to buy with severance payments the right to dismiss an employee for any reason. However, where an employer "voluntarily agrees to confer remedies and rights to its employees," there is a "contract by which it is bound [and] the employer cannot ignore its consequences." Appellant claims that, in this case, IAU voluntarily bound itself to provide the additional remedies explicitly or implicitly contained in the Faculty Handbook. Otero-Burgos relies heavily on a decision of the Puerto Rico Supreme Court, Selosse v. Fundación Educativa Ana G. Méndez, 22 P.R. Offic. Trans. 498 (1988), which he claims

-13-

establishes the availability of a breach of contract action for a professor terminated in violation of an employment contract.[16]

Appellees counter that IAU, a private employer, did not hire Otero-Burgos for a "fixed term," and therefore that Law 80 is his exclusive remedy. They insist that to treat Otero-Burgos, despite his tenured status, differently than other private sector employees would belie the plain meaning of the statute. For the purposes of Law 80, a tenured professor is in the same position as any other employee "who has successfully completed a probationary employment contract" because "[t]he professor's continued employment would be contingent upon his/her continued satisfactory performance and compliance with the employer's rules and regulations." Finally, they argue that Selosse is inapplicable here because Selosse involved the denial of tenure, not the termination of a tenured professor.

We review de novo the district court's determination that Law 80 barred Otero-Burgos's breach of contract claim. Montfort-Rodríguez v. Rey-Hernández, 504 F.3d 221, 224 (1st Cir. 2007). In reviewing this legal conclusion, we must ask whether Law 80 even applies to Otero-Burgos's tenure contract. To answer this

---

[16] Appellant's brief also argues that the University violated Otero-Burgos's right to "academic freedom." However, this claim goes to the merits of a potential breach of contract claim, not to the threshold question of its availability, which is the only issue before us.

-14-

question, we begin by examining the statute and the tenure contract.

**A.  Law 80**

Law 80 imposes a monetary penalty on employers who dismiss employees without just cause.  Hoyos v. Telecorp Commc'ns, Inc., 488 F.3d 1, 6 (1st Cir. 2007).  In this way, Law 80 modifies the concept of at-will employment, Hernandez Barreto v. ITT World Directories, Inc., 62 F. Supp. 2d 387, 394 (1999), which traditionally permits the employment relationship to be severed at any time, and for any reason,  see Black's Law Dictionary 566 (8th ed. 2004).  Because the doctrine of employment at will dictates that "an employee without a contract for a fixed term [may] be hired or fired for any reason or no reason at all," it follows that "employees categorized as 'at will' [have] no legal interest in continuing job security." Mark A. Rothstein et al., Employment Law § 1.4, at 9-10 (1994) (emphasis added).  For this reason, a terminated at-will employee is typically not entitled to compensation.

Law 80 changes this situation for those employees to whom it applies.  By its terms, Law 80 offers relief for "[e]very employee in commerce, industry, or any other business or work place . . . in which he/she works for compensation of any kind, contracted without a fixed term, who is discharged from his/her employment without just cause."  P.R. Laws Ann. tit. 29, § 185a.

-15-

"A discharge made by mere whim or fancy of the employer or without cause related to the proper and normal operation of the establishment shall not be considered as a discharge for [just] cause." Id. at § 185b. In such cases, the law requires the employer to pay the discharged employee a form of severance pay known as a "mesada," which is calculated using a formula provided by the statute. Id. at § 185a.[17] If an employee is terminated for a reason that constitutes "just cause" under the statute, the employer will not be liable under Law 80. See P.R. Laws. Ann. tit. 29, §§ 185a, b.

Puerto Rico courts have held that, for covered employees, Law 80 is the exclusive remedy for unjust dismissal unless another law specifically applies by its terms. See, e.g., Hernandez Barreto, 62 F. Supp. 2d at 394 ("[T]he only remedy available to an

_____

[17] The discharged employee is entitled to:

(a) The salary corresponding to two (2) months, as indemnity, if discharged within the first five (5) years of service; the salary corresponding to three (3) months if discharged after five (5) years and up to fifteen (15) years of service; the salary corresponding to six (6) months if discharged after (15) years of service.

(b) An additional progressive compensation equal to one (1) week for each year of service, if discharged within the first five (5) years of service; to two (2) weeks for each year of service, if discharged after five (5) years and up to fifteen (15) years of service; to three (3) weeks for each year of service if discharged after fifteen (15) years of service.

Id.

-16-

employee hired for an indefinite period of time for termination without just cause and absent discriminatory motive, is the relief provided for in Act 80."); <u>Biver</u> v. <u>Cooperativa Federal de Empleados Telefónicos</u>, 145 P.R. Dec. 165, 168 (1998); <u>Velez Rodriguez</u> v. <u>Pueblo Internacional</u>, 135 P.R. Dec. 500, 1994 P.R.-Eng. 909,576 (1994)[18]. <u>See</u> <u>also</u> <u>Vargas</u> v. <u>Royal Bank of Canada</u>, 604 F. Supp. 1036, 1040 (D.P.R. 1985). In contrast, "the remedy available to an employee hired for a fixed term or for the performance of a particular work [and therefore not within Law 80's reach] . . . , when he is dismissed from his employment before the expiration of the contract and in contravention of the terms of the same, is a damage action for breach of contract." <u>Nazario</u> v. <u>Velez & Asociados</u>, 145 P.R. Dec. 508, 1998 P.R.-Eng. 313060 (1998).

Thus, the applicability of Law 80 turns on whether the individual has "contracted without a fixed term" within the meaning of the statute. "Instead of culling selected words from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language." <u>O'Connell</u> v. <u>Shalala</u>, 79 F.3d 170, 176 (1st Cir. 1996). This is

---

[18] The official translations of many of the Puerto Rico cases cited herein do not contain internal page numbers. Accordingly, we cannot include pin-point citation references for those cases.

the approach that Puerto Rico's highest court has taken when interpreting Law 80 specifically:

> Each legislative action has a purpose. It aims to right a wrong, change an existing situation, complement already-enacted regulations, promote a specific good or the general well-being [of the population], recognize or protect a right, create public policy, or formulate a plan of government. There must always be a reason for a law to exist, and situations that do not fit within that reason should not be considered included within its scope, even though they might appear to be so from the letter of the law.

Secretario del Trabajo v. G.P. Indus., Inc., 2001 TSPR 4, 2001 WL 58005, at *6 (2001) (translation ours).

The Puerto Rico Legislature conceived of Law 80 as a remedial measure that would provide employees with a baseline level of economic protection from the consequences of arbitrary dismissals. The legislation's Statement of Motives "asserts the right of Puerto Rican workers to more effective protection of their employment through a law which 'affords more just remedies commensurate with the damages caused by an unjustified discharge and at the same time discourages the incidence of this sort of discharge.'" Rodriguez v. E. Air Lines, Inc., 816 F.2d 24, 27 (1st Cir. 1987).

In 1979, less than three years after Law 80 was enacted, the Puerto Rico Department of Labor and Human Resources published a document entitled "Guías Para la Aplicación y Interpretación de la Ley 80" - Guidelines for the Application and Interpretation of

-18-

Law 80 ("Guidelines"). This publication was revised and reissued in 2005, and has been treated by numerous courts, including ours, as informative. See, e.g., Hosp. Cristo Redentor, Inc. v. NLRB, 488 F.3d 513, 524 (1st Cir. 2007) (citing Guidelines for the proposition that Law 80 was not meant to interfere with the NLRA); Quiñones Irizarry v. TLD de P.R., 217 F. Supp. 2d 194, 198 (D.P.R. 2002) (using Guidelines to support its holding that changes in technology or design in the employer's products or services may constitute just cause for dismissal).[19]

The Introduction to the 2005 edition of the Guidelines emphasizes that Law 80's principal objective was to discourage wrongful terminations by requiring mandatory severance payments for such dismissals. The Guidelines note that until 1930,[20] "an employee contracted without a fixed term lacked any protection in the law, under which the employer could fire him on a whim" without incurring any liability. Accord Vargas, 604 F. Supp. at 1039 (Law 80 sought to "strike a balance between the freedom of choice inherent to an employer and the social need to do away with

---

[19] See also I.T.T. W. Hemisphere Directories, 8 P.R. Offic. Trans. 564 (citing earlier version of Guidelines); Coca-Cola Bottling Co. of P.R., Inc. v. Unión de Tronquistas, 109 D.P.R. 834, 1980 WL 138534, 9 P.R. Offic. Trans. 1123 (P.R. 1980) (same).

[20] On April 28, 1930, the Puerto Rico Legislature passed Law 43, the first in a series of legislative initiatives that preceded - and were later replaced by - Law 80. Law 43 allowed an unjustly terminated employee to recover compensation equivalent to the salary he would have received in a week, fifteen days, or a month, depending on the frequency with which he was paid. Id.

-19-

arbitrary terminations of employment"). Finally, the Guidelines also discuss the relationship between Law 80 and collective bargaining, stating that, although Law 80 represents a minimum remedy for wrongful termination, the parties have the power to contract for any remedy above and beyond Law 80's protections.[21]

The Puerto Rico Supreme Court has also discussed the purposes of Law 80, opining that Law 80's statement of purposes as well as its legislative history reflect the legislature's interest in "discouraging unjust discharges." Velez Rodriguez, 1994 P.R.-Eng. 909,576. Specifically, that court has quoted a joint report of the Senate Standing Committees on Labor and Civil Rights, issued just before Law 80's passage, as evidence that one of the legislation's primary purposes was "to give more protection to workmen whenever they confront a situation of dismissal." I.T.T. W. Hemisphere Directories, Inc., 8 P.R. Offic. Trans. 564 (internal quotations marks and citation omitted). This legislative history suggests that Law 80 was meant to apply to - and most importantly, to provide a remedy for – those employees who would otherwise be unprotected against the whim of their employers.

---

[21] To further guard against the effects of the inequality of bargaining power between employer and employee, and to prevent the latter from being mistreated, the Puerto Rico legislature specifically provided that an employee may not waive his rights under Law 80. See 29 P. R. Laws Ann. tit. 29, § 185i.

## B. The Tenure Contract

The parties agree that IAU's Faculty Handbook sets forth the terms of Otero-Burgos's tenure contract.  It provides that "a tenured appointment is normally for the rest of the appointee's working years or until resignation, except in cases of bona fide institutional financial stress, program changes, or termination, according to the provisions in this handbook."  Handbook § 5.3.5. Absent adequate cause for termination (such as "prolonged mental or physical incapacity") or "changes in educational programs that make his service unnecessary," the conferral of tenure at IAU "guarantee[s] the continuation of [the professor's] full-time employment" until he resigns or retires.  § 5.8.  Section 5.9.9 of the Handbook defines "dismissal" as "the severance action by which Inter American University ends its contractual relationship with a tenured faculty member. . . before the expiration of his contract" (emphasis added).

In 1940, a joint statement issued by the American Association of University Professors (amicus curiae AAUP), and what is now the Association of American Colleges and Universities, described the nature and aims of tenure in a formulation that has since been endorsed by numerous courts[22] and universities, including

---

[22] See, e.g., Hulen v. Yates, 322 F.3d 1229, 1239 (10th Cir. 2003); Browzin v. Catholic Univ. of America, 527 F.2d 843, 847 n.8 (D.C. Cir. 1975).

IAU.[23]  See 1940 Statement of Principles on Academic Freedom and Tenure with 1970 Interpretive Comments, in AAUP Policy Documents and Reports 3-11 (10th ed. 2006), available at http://www.aaup.org/AAUP/pubres/policydocs/contents/1940statement .htm.  It notes that tenure is intended to foster academic freedom and to offer the kind of "economic security" that would make the profession attractive to "men and women of ability."  Id. at 3. Indeed, the IAU Handbook itself expresses this idea almost verbatim, stating that tenure contributes to the University's ability to fulfill its obligations to its students and to society by offering "economic security" and "professional satisfaction" to "men and women of ability and learning."  § 5.8.2.[24]

---

[23] See, e.g., Handbook at § 4.1 (incorporating portions of the 1940 Statement into its discussion of academic freedom).

[24] The AAUP Statement defines tenure more specifically as "permanent or continuous" employment after "the expiration of a probationary period," which should be terminated "only for adequate cause, except in the case of retirement for age, or under extraordinary circumstances because of financial exigencies."  Id. at 4.  Appellants and amici similarly characterize tenure as a promise of job "permanence."  Courts have also stated that the type of tenure contract at issue here provides "permanent or continuous" employment.  See, e.g., Collins v. Parsons Coll., 203 N.W.2d 594, 598 (Iowa 1973) (concluding that a tenured professor who was terminable only for just cause "had an agreement for a permanent position," and thus that his case was not governed by "decisions involving indefinite agreements").  Before this court, Otero-Burgos and amici argue that we should conceive of tenure as a type of "permanent" employment, and therefore as employment with a "fixed term" that is not subject to Law 80.  However, we need not address the issue of whether all tenured positions are outside the scope of Law 80, since we conclude infra that the specific language of the contract between Otero-Burgos and the University demonstrates that he was not employed "without a fixed term."

-22-

We have established that the tenure contract between Otero-Burgos and IAU is not remotely the at-will employment arrangement to which Law 80 is addressed. The question we must answer now is whether, despite this fact, Otero-Burgos should still be considered as employed "_without a fixed term_" within the meaning of the statute as appellees assert. P.R. Laws Ann. tit. 29, § 185a (emphasis added).[25] Otero-Burgos argues that his tenure contract should be considered to last for "the professional lifetime of a professor," and that such a term places his employment relationship with the University beyond Law 80's reach. In response, IAU argues that because the tenure contract provides for termination in certain enumerated circumstances (such as financial exigency or gross misconduct), Otero-Burgos is still hired for an "indefinite" period of time, and hence is an employee "without a fixed term" under Law 80.

There is a clear difference between a worker whose employment is not subject to a specific temporal limitation, but who may be fired for any reason, and Otero-Burgos, who, under the terms of his tenure contract, presumptively retains his job until retirement, absent the occurrence of specific events described in the tenure contract. A tenured appointment at IAU "is normally for

---

[25] The original Spanish for "contracted without a fixed term" is "contratado sin tiempo determinado."

the rest of the appointee's working years or until resignation." Handbook § 5.3.5. Otero-Burgos is "guaranteed the continuation of full-time employment" until he either chooses to retire or is properly dismissed for cause in accordance with the terms of his contract. Examining these contractual provisions in light of Law 80's legislative history, we conclude that Otero-Burgos is not an employee hired "without a fixed term" within the meaning of Law 80.[26] Indeed, a legal regime that did not grant Otero-Burgos any remedies beyond those provided by Law 80 would render the concept of tenure embodied in the Handbook meaningless. See McConnell v. Howard Univ., 818 F.2d 58, 67 (D.C. Cir. 1987) (refusing to interpret a tenured professor's employment contract in a way that would "render[] tenure a virtual nullity").

As Otero-Burgos observes, tenure as described in the Handbook is inherently incompatible with allowing a university to simply "buy" the right to dismiss a tenured instructor for Law 80's modest severance payment. Indeed, that approach would mean that despite his tenured status, Otero-Burgos would, as a matter of law, have only the remedy he would be entitled to if he were an at-will employee serving at the university's pleasure. See Rodriquez, 816 F.2d at 28 ("Law 80 apparently was passed with the hope that

---

[26] See also Norfolk S. Ry. Co. v. Harris, 59 S.E. 2d 110, 114 (Va. 1950) (finding that presumption of at-will employment did not apply because contract providing that employment would continue "until the plaintiff gave to the defendant just cause to end it" represented a fixed term contract).

increasing the penalty would discourage unjustified discharges, but an employer willing to pay the price is free to discharge whomever he or she pleases."). Such an approach would ignore what we have described as the "substantial commitment" that universities make to their tenured faculty, and that IAU made to Otero-Burgos by granting him tenure. Lovelace v. Se. Mass. Univ., 793 F.2d 419, 422 (1st Cir. 1986). Amicus AAUP warns persuasively that affirming the district court's decision would "subvert the time-honored consensus as to the nature of tenure, undoing a careful balance between the respective interests of professors and universities," effectively "convert[ing] tenured professors into at-will employees . . . to the detriment of society and, indeed, of institutions of higher education."

Puerto Rico courts have recognized the importance of tenure and the uniqueness of the employment relationship between a university and a tenured faculty member. In Selosse, a professor who had been denied tenure sued her former employer, a private university, for breach of the employment contract. 22 P.R. Offic. Trans. at 513. The Supreme Court of Puerto Rico explained that "the rules and regulations governing the rights and obligations of faculty members are part of the contract" between a university and its faculty. 22 P.R. Offic. Trans. at 513-14. The court further invoked Puerto Rico Civil Code article 1044 (P.R. Laws Ann. tit. 31, § 2994), which provides that "[o]bligations arising from

-25-

contracts have legal force between the contracting parties, and must be fulfilled in accordance with their stipulations," stating that courts were empowered to enforce these obligations. Id. at 514. After affirming a finding that the university had not complied with its own regulations in conducting Selosse's tenure evaluation, the court concluded that she had been denied tenure in a manner that "violated the spirit of the contractual procedure." Id. Thus, Selosse was entitled to lost wages, reinstatement, and "[a] new, objective evaluation" that would comport with the procedures set forth in the employment contract. Id. at 517-18.

While they do not dispute the premise that the Faculty Handbook was part of the employment contract between IAU and Otero-Burgos, appellees argue that Selosse is inapposite. They contend that Selosse concerned a denial of tenure, not a claim for wrongful dismissal, and that only the latter falls within the ambit of Law 80, which precludes a breach-of-contract claim like Selosse's. In effect, appellees' argument, taken together with the holding of Selosse, contemplates a particular moment in time -- ironically, the granting of tenure -- when the tenure contract would cease to be enforceable. This argument has the counterintuitive effect of affording more rights to professors before they achieve tenure than after.

The Puerto Rico Supreme Court has, in fact, addressed the merits of a tenured professor's claim for breach of contract

stemming from an allegedly unjustified dismissal.  See <u>Mercado</u> <u>Rivera</u> v. <u>Catholic Univ. of P.R.</u>, 143 P.R. Dec. 610, 1997 P.R.-Eng. 878,471 (1997).  While the court in <u>Mercado Rivera</u> held that the university had not breached its contract with the professor, the opinion reaches the merits of the claim, discussing at length the binding nature of the faculty manual, a freely negotiated contract. The opinion does not mention Law 80.

Indeed, in a decision that appellees characterize as "implying that Law 80 squarely applies in private higher education institutions [sic] settings [such as IAU]," the Puerto Rico Supreme Court itself focused on the special features of the tenure relationship in a case involving a public university.  <u>See</u> <u>Universidad de P.R.</u> v. <u>Asociación Puertorriqueña de Profesores Universitarios</u>, 136 P.R. Dec. 335 (1994).[27]  In ruling that university professors were "managerial employees," and therefore not covered by the Labor Relations of Puerto Rico Act, the court was categorical in distinguishing the status of tenured faculty from that of other employees, declaring that "it does not make judicial sense to pretend to put on the same level the professors with the office clerks, the maintenance workers and the security guards of the institution who scarcely exert any discretion in the direction of the [university]."  <u>Id.</u>  The court mentioned tenure as

---

[27] At oral argument, counsel for the University referred to this untranslated case.  At the panel's request, appellees submitted a certified translation.

one of several factors "that distinguish the condition of the [university] professors from the workers of a private <u>corporation, like the ones traditionally considered by the labor relations laws</u>." <u>Id.</u> (emphasis added). The court observed that, under Law 80, "private employers may terminate an employee without previous determination of fair cause without any other responsibility" than paying the statutory severance. In contrast, because of tenure, "[n]obody can terminate a regular professor unilaterally," giving him "continuance and job security."

IAU interprets these passages as drawing a distinction between Law 80's applicability at public and private <u>universities</u>. However, we read the opinion as contrasting the singular relationship between a university and its tenured faculty, such as the one between Otero-Burgos and IAU, with the status of employees at a typical for-profit business enterprise. This precedent, though marshaled by IAU, actually supports appellant's position.[28]

The IAU Faculty Handbook confirms that the University itself understands tenure as a "substantial commitment," and, more generally, that it affords the concept of tenure its traditional

_____

[28] <u>Cf.</u> <u>McConnell</u>, 818 F.2d at 64 n.7 ("Contracts are written, and are to be read, by reference to the norms of conduct and expectations founded upon them. This is especially true of contracts in and among a community of scholars, which is what a university is. The readings of the market place are not invariably apt in this non-commercial context." (citation omitted)).

meaning.  Section 5.8 of the Handbook provides that a tenured professor is

> guaranteed the continuation of his full-time appointment, unless there is proof of adequate cause for termination of his services, such as prolonged mental or physical incapacity, or of changes in educational programs that make his service unnecessary, or that the ranked faculty member resigns or retires.

See also Handbook § 5.3.5 ("[A] tenured appointment is normally for the rest of the appointee's working years or until resignation, except in cases of bona fide institutional financial stress, program changes, or termination, according to the provisions in this handbook.").

Elaborating on the functions served by tenure, the Handbook asserts that the common good, which the University is intended to serve, depends largely upon the "free search for truth and its free exposition," and that "[t]enure is one means of insuring such freedom to the faculty members of the Institution." Id. at § 5.8.2.  The Handbook continues:

> To serve the common good effectively, the role of a faculty member at the University must be sufficiently attractive to appeal to men and women of ability and learning. This, in part, is achieved through the economic security and the professional satisfaction felt by the faculty member who is offered tenure. Thus, tenure contributes effectively to the success of the University in fulfilling its obligations to its students and to the society that it serves. In addition, it protects faculty members against undue pressures, from both inside and outside the academic

> community; it safeguards academic freedom,
> which is essential to the institution.

Id. Contrary to the provisions of the Handbook, Otero-Burgos's tenure contract simply could not fulfill its function of safeguarding academic freedom and providing economic security if the severance payment were the only consequence faced by the university for firing him in violation of that contract.

## IV.

We summarize our conclusions. Appellees do not dispute -- nor could they -- plaintiff's assertion that the Faculty Handbook constitutes a binding contract between IAU and its faculty. The Puerto Rico Legislature did not intend to write a "remedial" statute that, while purporting to provide relief for at-will employees lacking any other legal recourse, would limit the remedies of a tenured professor where, as here, his contract "guaranteed the continuation" of his full-time employment for the "rest of his working years." This is not an employment contract "without a fixed term," and hence it is not subject to Law 80. Indeed, to rule otherwise and apply Law 80 in this case would fundamentally undermine not only the institution of tenure as envisioned by the Handbook, but also the conceptual basis of Law 80 itself.[29]

---

[29] Although this decision is grounded in our conclusion that Law 80 does not apply to Otero-Burgos based on the terms of his tenure contract, we note that several cases suggest that even if Law 80 did apply, it would not necessarily limit Otero-Burgos's

Accordingly, Otero-Burgos's breach of contract claim should not have been dismissed.  He is entitled to the opportunity to prove his claim that the University dismissed him in violation of the terms of his tenure contract.  If he establishes that he was fired without "adequate cause" within the meaning of the tenure contract, he will be eligible for the panoply of generally available contract remedies.  His breach of contract claim should go forward.

Vacated and remanded for further proceedings consistent with this opinion.  Costs to appellant.

---

contractual remedies.  These cases arise primarily in the collective bargaining context. See, e.g., Santoni Roig v. Iberia Líneas Aéreas de Espana, 688 F. Supp. 810, 817 (D.P.R. 1988); Challenger Carribean Corp. v. Union General de Trabajadores de P. R., 903 F.2d 857, 869 (1st Cir. 1990).  There is even a recent case from Puerto Rico's intermediate appellate court that suggests that Law 80 would not limit the contractual rights of individuals employed without a definite term. See Díaz Laboy v. Asociación de Empleados del Estado Libre Asociado de P.R., Case No. KPE2001-0997, 2005 WL 2917486 (P.R. Cir. 2005) (certified translation provided by the parties).  Nevertheless, given our conclusion that Law 80 does not apply to the tenure contract of Otero-Burgos, we need not explore this line of cases.